14859

HOLLIS v. ARMOUR & CO.

(2 S. E. (2d), 681)

*Messrs. Grier, McDonald & Todd,* for appellant, ██

172

*Messrs. W. H. Nicholson* and *W. R. Dunn,* for respondent,

April 7, 1939.

The opinion of the Court was delivered by MR. CHIEF JUSTICE STABLER.

This is an action for damages. The plaintiff alleged that the defendant is engaged in the business of manufacturing meats, canned goods, etc., and advertises and holds out to the public that such goods are pure, wholesome and fit for human consumption; that one T. L. Coleman, a merchant, bought a sealed can of sausage in oil, a product of the defendant, which was delivered to him on July 24, 1937, and remained in his store sealed until late in the afternoon of

July 26th; that during the morning of the following day, July 27th, the plaintiff purchased from Coleman some of the sausage in oil from the said can, and that upon eating the sausage. he "immediately became deathly sick." He further alleged:

"That the said sausage was put in rusty cans or containers which the defendant, its agents and servants, knew or should have known would cause the said sausage to become poisoned and dangerous.

"That the defendant allowed and caused the said sausage to be improperly prepared and canned and there was present in the said sausage poisonous substances which was known by the defendant or through the exercise of due care should have been known.

"That the plaintiff's illness was caused by the poisonous substances that were present in the sausage and which presence was known or should have been known to the defendant, its agents and servants; that plaintiff's illness was caused by the negligence, carelessness and wantonness of the defendant, its agents and servants in the manufacturing, canning, packing, compounding, selling and delivering said sausage which were unfit for human consumption."

The defendant, answering, admitted that it was engaged in the business of manufacturing meats, canned goods, etc., and that Coleman had purchased a sealed can of its sausage in oil, but denied the other allegations of the complaint. For a further defense, it alleged "that in manufacturing, canning, compounding, packing, inspecting and selling its food products, including sausage in oil, it used and uses all reasonable care and caution to insure the purity, cleanliness and wholesomeness of said products, and uses the most modern, sanitary and approved methods employed in the manufacture and sale of food products, and known to be the highest state of the art of manufacturing same, and that sausage in oil manufactured and sold by defendant, including the sausage referred to in the complaint herein, was manufac-

tured in establishments under the inspection of the Bureau of Animal Industry and pursuant to the acts of Congress and rules and regulations adopted pursuant to statute, and said sausage was sound, wholesome and fit for human consumption when sold by the defendant."

The case was tried in April, 1938. At the conclusion of the testimony, the defendant asked for a directed verdict in its favor upon numerous grounds. The motion was refused and the jury found for the plaintiff $1,500.00. A motion for a new trial was also denied, and this appeal followed.

There are twenty-six exceptions, some of them being objectionable as to form. We will not discuss them *seriatim,* but all of them will be noticed in our disposition of the appeal.

The following questions are fairly raised: (1) Did the Court commit error in not directing a verdict for the defendant? (2) In its instructions to the jury? (3) In refusing to charge certain requests? (4) In denying the motion for a new trial? These we will consider in the order named.

First. Certain exceptions raising this question present in varying form the contention of the appellant that the only reasonable inference to be drawn from the testimony is that the defendant was not negligent, reckless or wanton in any of the particulars named in the complaint, and that the Court erred in not directing a verdict on this ground of its motion.

An examination of the record discloses that there is no dispute as to the purchase by T. L. Coleman, a merchant, from Thomas & Howard, jobbers, of Newberry, South Carolina, of the sealed can of sausage in question, a product of the defendant company; and that the sausage was delivered at the store of Coleman on Saturday, July 24, 1937, that he opened the can late in the afternoon of Monday, July 26th, and that he sold some of the sausage to the

plaintiff early the following morning, July 27th. Coleman testified, among other things, that he opened the can in the usual way with a knife and took out the sausage that he sold with an ordinary steel ice pick, the pick being a bright, shiny one, free of rust; that he did not notice anything wrong with the sausage or the can at the time, and detected no odor; that Hollis and several others to whom he sold some of the sausage were all made sick; that when he learned of this fact, he examined the can, and by tilting it over found that it was corroded or rusted on the inside; that he furnished samples of the sausage to interested parties, and gave the can to a man who called for it, and when it was returned to him all of the sausage and oil had been taken out. The witness identified the can introduced in evidence as the one from which he sold the sausage, and pointed out that something had caused the sausage to disintegrate, its links having disappeared. He further testified that in his twenty-six years' experience he had never seen a can in that condition before, although he had kept sausage in other cans for some time. He also stated that Mr. Anderson, a salesman of the defendant, came into the store about thirty days later, and that when the witness showed him the can and pointed out the corrosion, he said "it was a bad can that got by inspection."

Hollis stated that when he purchased the sausage; Coleman wrapped it in paper and put it in a sack, and that the witness took it with him in his car about fourteen miles to his work and ate it at his dinner time, about twelve o'clock; that he and Mr. Perrin then went out to look over a detour road and while out there he became very ill, and when he got back to the place where he was working, he found two of his Negro hands who had eaten some of the sausage also ill. Perrin testified that Hollis and the Negroes were taken ill as stated, one of the Negroes being practically unconscious, and that they were all carried down to Greenwood to Dr. Fuller's office. Three Negroes also testified

that they had eaten some of the sausage in question and were made ill.

Dr. Fuller testified as to the condition of Hollis when brought to him on the afternoon of July 27th. He stated that the plaintiff was apparently a very ill man, and that he put him to bed; that "he was cold and clammy and perspiration standing on his face and hands, and his pulse was rapid and very weak, and nauseated, he vomited several times in the office;" that in his opinion, from his diagnosis, Hollis had what is commonly called ptomaine poison, which is a common name for food poisoning; and that when he inquired and was told what Hollis had eaten, he concluded that his illness was due to the sausage. He also testified that he examined the Negroes brought in at the same time, and found that their symptoms and condition were the same as that of Mr. Hollis; and that he gave them treatment at his office and sent them to the hospital.

Gatlin, a salesman with Thomas & Howard Company, stated that he got two samples of the sausage from Coleman, the second about six weeks after the first, and gave them to Mr. Blackwell, the manager of the house; that when he got the second sample, Coleman showed him the side and bottom of the can, and it looked like it had corroded; and that its condition then as compared to the condition of the can in evidence seemed to be about the same. Ford, a salesman with the defendant company, testified that he saw the can, then in evidence, for the first time that day, and that it was in a very unusual condition, if it was in that condition at the time it was sold. Penticuff, superintendent of the sausage manufacturing department of the defendant, testified that he did not think it would be safe to eat sausage out of a can that was in the condition of the one then in Court, but he did not believe it was in that condition at the time it was sold; that leaving sealed cans of sausage in a room of ninety degrees of heat for ten days does them no harm; and that in inspecting the cans, it was

occasionally found that one was not good, a very small percentage. Anderson, a salesman with Armour and Company, denied that he had told Coleman what the latter had testified to. He stated, however, that he "never saw a can that good sausage came out of in the condition that can is now," but that he could not say he had not seen good sausage come out of a can in the condition of the one he saw at Mr. Coleman's store. M. M. Calhoun, observer at the climate regional observatory at Greenwood, testified that the records of his office showed the temperature from July 24th to July 30th, 1937, to be from 90 to 92 degrees.

The appellant offered much testimony on this point, in addition to that referred to above, to the effect that the samples of sausage taken from the can in question were submitted to tests for mineral and bacterial poisoning. The witnesses who made these analyses testified that no trace of poison of any kind was found in the sausage; but it appears that the tests for bacterial poisoning was not at all conclusive, as there could have been bacteria in the sausage at the time it was eaten by the respondent, but which would have died before the analyses were made. The testimony for the appellant also tended to show that its methods of manufacturing, inspection, etc., of meats, including the canned sausage in question, were and are the most modern, sanitary and approved methods employed in the manufacturing of such foods.

We have read and considered with much care the voluminous testimony on this point, and are satisfied that the trial Judge properly refused to sustain this ground of the motion. While the doctrine of *res ipsa loquitur,* as contended by the appellant, does not prevail in this State the rule is not applicable under the facts of this case as disclosed by the testimony, keeping in mind that negligence may be established, not only by positive evidence, but by circumstantial evidence as well. The contention of the appellant, that if the respondent was poisoned by the

sausage which he ate, it was due to the acts of Coleman, the retail merchant, in the opening of the can and in the manner of handling the sausage in the sale of it, was a question for the jury under the evidence. As every case must be decided under its own peculiar facts, the decisions are rarely found to be helpful. But see *Culbertson v. Coca-Cola Bottling Co.,* 157 S. C., 352, 154 S. E., 424; *Burnette v. Coca-Cola Bottling Co.,* 157 S. C., 359, 154 S. E., 645; *Tate v. Mauldin,* 157 S. C., 392, 154 S. E., 431; *Housand v. Armour & Co.,* 173 S. C., 268, 175 S. E., 516; *Irick v. Peoples Baking Co.,* 187 S. C., 238, 196 S. E., 887.

As to the second group of questions presented, we have read with much interest the able argument of counsel for appellant thereabout. We are satisfied, however, that the conclusion reached by the Circuit Judge was correct, to wit, that the South Carolina Pure Food and Drug Act, Section 1452 of the Code of 1932, applies to the facts of this case; and that the Acts of Congress, known as the Pure Food and Drug Act of 1906 (21 U. S. C. A., § 1, *et seq.*), *the Meat Inspection Act* of 1906 (34 Stat., 669), and the rules and regulations of the Bureau of Animal Industry, are not exclusive of the State laws, Acts and policies.

It is true that the power to regulate commerce between the states is left to the Congress, but a state may enact laws that indirectly affect interstate commerce so long as such laws are not a burden thereon or does not displace or interfere with the Federal law. The police power is left to the states and they may use this power to protect the public health and safety of the citizens of the state. In *Southern Railway Co. v. King,* 217 U. S., 524, 30 S. Ct., 594, 595, 54 L. Ed., 868, the Supreme Court of the United States, relative to this question, said: "It has been frequently decided in this Court that the right to regulate interstate commerce is, by virtue of the Federal Constitution, exclusively vested in the Congress of the United States.

The states cannot pass any law directly regulating such commerce. Attempts to do so have been declared unconstitutional in many instances, and the exclusive power in Congress to regulate such commerce uniformly maintained. While this is true, the rights of the states to pass laws not having the effect to regulate or directly interfere with the operations of interstate commerce, passed in the exercise of the police power of the State, in the interest of the public health and safety, have been maintained by the decisions of this Court."

We do not think, upon examination of the State law ■ and of the numerous Federal authorities cited by counsel, that it may soundly be held that the State Act operates in any way as a burden on interstate commerce or displaces or directly interferes in any manner with the Federal Acts and regulations. *Crutcher v. Kentucky,* 141 U. S., 47, 11 S. Ct., 851, 35 L. Ed., 649. As to when a subject of interstate commerce, the canned sausage here, becomes a part of the general property of the country and subject to the laws of the state into which it is brought, see *Welton v. Missouri,* 91 U. S., 275, 23 L. Ed., 347; *Williams v. Walsh,* 222 U. S., 415, 32 S. Ct., 137, 56 L. Ed., 253; *Weigle v. Curtice Bros. Co.,* 248 U. S., 285, 39 S. Ct., 124, 63 L. Ed., 242, and other decisions.

Upon full consideration, we are of opinion that the trial Judge properly refused to direct a verdict on any of the grounds of the motion included in the second group of questions.

Second. The appellant makes eight excerpts taken ■ from the general charge of the Court the basis of alleged error. We deem it unnecessary to quote these excerpts or the exceptions challenging their correctness. What we have said above applies here in part. Furthermore, it is elementary that the entire charge must be referred to in determining whether what was told the jury in any particular portion of it was prejudicial to the complainant.

When the charge here is thus considered, we find no reversible error as contended by the appellant; it was substantially a correct statement of the law applicable under the pleadings and the evidence in the case.

Third. The Court refused to instruct the jury, at the request of appellant, as follows:

"I charge you that the Pure Food and Drug Act of the State of South Carolina, which, as a whole is known as Sect. 1452, Vol. 1, of the Code of 1932, does not apply to the facts of this case; that the plaintiff does not allege and charge that the defendant here violated this Act.

"I charge you that there is no evidence that the defendant violated the Pure Food and Drug Act of the United States."

These requests to charge were also made grounds of the motion for a directed verdict, which we have held was properly refused. We think that by a liberal construction of the complaint the Pure Food and Drug Act referred to was substantially alleged to have been violated; and there was some evidence which tended to establish these and other allegations of the plaintiff. We are of opinion, therefore, and so hold, that the requests were properly refused.

Fourth. The verdict of the jury was in the following form: "We find for the plaintiff $1,500.00. W. D. Lanier, Foreman." The appellant later made a motion for a new trial upon the ground that the award was not in accordance with or responsive to the instructions of the Court, as it did not show whether the amount was for actual or for punitive damages or for both.

It appears that the attorneys for the appellant were present at the time the jury returned their verdict, but made no objection as to its form or asked that it be clarified or changed so as to show whether the amount awarded was for actual or for punitive damages or whether it included both, but sat silently by and permitted the jury to disperse without raising any question thereabout. Under these facts, counsel's objection to the form of the verdict, made for

the first time on motion for a new trial, came too late and must be deemed to have been waived. *Rhodes v. Southern R. Co.,* 139 S. C., 139, 137 S. E., 434; *McAlister v. Thomas & Howard Co.,* 116 S. C., 319, 108 S. E., 94; *Rhame v. City of Sumter,* 113 S. C., 151, 101 S. E., 832; 64 C. J., 1110. We are not in agreement with appellant that the question here raised is governed by the decision in *Lorick & Lowrance v. Walker & Co.,* 153 S. C., 309, 150 S. E., 789. A reading of the opinion in that case discloses an entirely different situation from that presented here.

It is finally contended that the Court, in any event, should have granted a new trial *nisi,* as the verdict "is excessive and unreasonable." As is seen from the testimony of Dr. Fuller, to which we have referred, the plaintiff was made very, if not seriously, ill; and although, despite this fact, the amount of the verdict may seem somewhat large, we cannot say that the trial Judge abused his discretion in refusing to reduce it.

All of the exceptions have been considered and are overruled.

The judgment of the Circuit Court is affirmed.

MESSRS. JUSTICES BONHAM, BAKER and FISHBURNE concur.

MR. JUSTICE CARTER did not participate on account of illness.