15171

BOYLSTON v. ARMOUR & CO.

(12 S. E. (2d), 34)

2

*Messrs. Douglas McKay, J. B. McCutcheon* and *Harley & Harley* for appellant,

*Messrs. Cooper & Maher, Brown & Watts, C. T. Graydon* and *John Grimball,* for respondent,

December 23, 1940.

The opinion of the Court was delivered by MR. ASSOCIATE JUSTICE STUKES.

Respondent was awarded a verdict in the sum of Eighteen Hundred Dollars actual damages, the trial Judge having instructed against punitive damages, by a jury in the Richland County Court against Armour & Company, a corporation of Illinois, and from the judgment entered thereon this appeal was taken.

In the complaint it was alleged that respondent on March 17, 1937, partook in the Dixie Cafe in the town of Blackville, South Carolina, of a serving of ham which turned out to have been labeled "Armour Star Ham," in the preparation, packing and sale of which appellant is engaged and advertises and warrants this product as being superior food for human consumption, but that in fact the portion eaten by respondent was impure and contained deleterious matter which caused respondent to become violently and painfully ill, confining him to bed and resulting in expenditures for medical bills; and that such injury and damage were caused "by the ham produced by the defendant being unfit for human consumption as it was advertised, warranted, and represented and that thereby the defendant violated the Pure Food and Drug Act of the United States of America and the State of South Carolina, 21 U. S. C. A. § 1 et seq.; Code of 1931, § 1452, and the conduct of the defendant in preparing, producing, packing, and offering for sale the said ham as aforesaid was negligent, reckless, wilful, and wanton", to respondent's damage in the sum of Three Thousand Dollars. The answer was a general denial. When the case was reached for trial appellant asked the Court to require an election by respondent as to whether he was proceeding under the "Pure Food Statute of

South Carolina or the Pure Food Statute of the United States", but the Court reserved decision which was made in effect at the conclusion of respondent's testimony when it was held that there had been *no proof of the Federal Statute so it was not involved* and the issues were confined to the alleged common-law negligence and violation of the State law, which latter the jury were instructed would constitute, if found, negligence *per se*. Incidentally, it was not necessary to prove the Federal Act but there was no objection to the ruling thereabout, emphasized above.

Timely motions for nonsuit, directed verdict and for a new trial, were made and refused, except as to punitive damages. The grounds for these motions were sufficiently inclusive to support the questions argued by appellant's counsel and were preserved for consideration here by proper exceptions. It is, therefore, necessary that the evidence be briefly reviewed and, in view of the nature of the questions involved, it may be done in the most favorable light to the respondent.

The ham was purchased in Blackville in the usual wrappings of a cured Armour ham, including an attached tag "Armour & Company, Chicago, Illinois," and the ham and the container bore the imprint "Armour & Company," by the cafe proprietor from an itinerant merchant who made delivery from a refrigerator truck; he was a customer of Armour & Company in Augusta, Georgia, just across the boundary river from this State and near Blackville. Upon the delivery of the ham it was, after unpacking and unwrapping, placed in the cafe refrigerator, taken therefrom the next morning by the cook and baked in the usual meat cooking utensil, thereafter allowed to cool for an hour or so and again placed in the refrigerator. On the next morning it was removed to a serving table and used in the service of customers, covered in the meantime by a cloth netting. Several patrons who ate of it, all such so far as the record shows, became sick and upon examination it was found to be in part discolored and somewhat soft. Upon

hearing of the illness of his customers who had eaten of it, the proprietor rewrapped the ham and again placed it in his refrigerator, thereafter removing it for the county health officer to cut into and further examine it, which was done in the office of a local physician in the presence of several witnesses, resulting in the discovery of the condition mentioned.

Some time later a traveling salesman of Armour & Company from Augusta, the appellant's witness Cowan, took it with the stated purpose of having the company analyze it, but it was not returned and the proprietor testified that no report was made upon it. Meanwhile the ham had been sent to the State Board of. Health in Columbia and to Clemson College in unsuccessful efforts to obtain an analysis of it at one of these places.

The purchase by the cafe from the itinerant was because of an emergency need; ordinarily it was supplied with such hams by shipment from Augusta on an Armour truck. The cafe was a cleanly one, regularly inspected and well rated by public health authorities. Respondent, who is County Farm Demonstration Agent, ate at the cafe at about one p. m., besides the ham, two vegetables, bread and coffee, and immediately drove by automobile to Columbia on business, after the conclusion of which in about an hour or an hour and a half he first became ill. A friend with him thereafter did the driving and after delays and interruptions on account of his sickness they returned to Blackville where respondent placed himself in the care of a physician who rendered emergency treatment, keeping him at his office for an hour or so, after which he was taken home by the doctor and placed in the charge of his family physician. There was medical testimony to a diagnosis and treatment of severe food-poisoning.

The testimony establishes that respondent was violently and seriously ill for several days, after which he unsuccessfully attempted to resume his business duties and was thereafter incapacitated from time to time aggregating several

weeks and was not fully recovered at the time of the trial. Other witnesses similarly affected, apparently to a lesser degree, after eating of the same ham, testified; all seemed to have had the same sorts of symptoms and all vomited the ham. The other customers of the cafe that day who did not eat ham were not so affected.

For the appellant, the manager of the Augusta plant testified that it was a branch of Armour & Company, a corporation of *Delaware*; it receives hams from the company's killing plants at Kansas City, Omaha, and Tifton, Ga., processes and finally packs them under the supervision and inspection of technical representatives of the United States government. Thereafter they are held in refrigeration until sold. The itinerant from whom the ham here in question was purchased by the Dixie Cafe has no connection with Armour & Company other than that he has been purchasing hams from the Augusta plant for about five and one-half years and peddling them by motor truck through Georgia and South Carolina. Their traveling salesman, Mr. Cowan, covers as a part of his territory Barnwell County, South Carolina, including Blackville. No hams come into the Augusta plant which do not bear the Federal government inspection symbol and all processed are similarly marked. The superintendent of the Kansas City plant, which alone had been supplying the Augusta plant about the time of this incident, testified as to its operation and the Government inspection of meat animals before and after slaughter and further that there is nothing unusual in "bluish-greenish coloring," but such is common in hams.

A Federal government inspector testified that he was stationed at the Armour Kansas City plant from October 1936, to August, 1937, being supervisor in charge of all inspectors detailed to that plant. He described the ante-mortem inspection of the animals, the killing and post-mortem inspection, etc., for the purpose of finding the product free from disease, sound in health and fit for human food. Defective meats which would probably produce sick-

ness upon consumption are condemned but if a defective animal or portion should by chance escape the inspectors it could bring about sickness after consumption.

The assistant chief chemist and bacteriologist of Armour & Company in Chicago testified generally as to organisms capable of causing food-poisoning and particularly as to his examination of the remainder of the ham here in question which was forwarded to him in April, 1937, by the Augusta plant manager and that his examination disclosed no poisonous properties and that mice, guinea pigs and baby chicks which were fed the cultures derived from the meat evidenced no symptoms of illness; that the perishability of a smoked ham depends entirely upon the conditions under which it is held and the purposes for which it was prepared, adverse conditions of temperature and humidity might cause spoilage in eighteen to twenty-four hours, but under ordinary conditions, thirty-two degrees temperature, etc., would hold up almost indefinitely, but a baked or prepared ham is highly perishable, and a bluish-greenish cast is not unusual in a cooked, smoked ham; that the symptoms of food-poisoning appear usually from fourteen to twenty-four hours after ingestion and sometimes not for six to ten days, depending upon various conditions, but there have been rare cases of as low as four hours; and finally that the cooking of the ham described in the testimony would destroy any food-poisoning organisms on or in it.

The manager of the Columbia plant of the appellant testified that it is "under Armour and Company of Illinois", does no interstate business whatever and during the past two or three years no sales have been made from the Columbia plant in Augusta or to the itinerant merchant who sold the fateful ham to the Dixie Cafe. However, the bacteriologist, witness for defendant, testified that the various Armour and Company plants at Chicago, Omaha, Kansas City, Tifton, etc., ship stuff from one to the other, backward and forward, in the process of cure, green or cured. He knew nothing of the corporate organizations; only that he was

employed at Chicago by "Armour and Company" where there was a manufacturing plant at Union Stock Yards.

It is interesting to note that in *Housand v. Armour & Company,* 173 S. C., 268, 175 S. E., 516, it appeared that a Maine corporation, Armour and Company, was doing business at Wilmington in our neighboring State to north. Thus we appear to have Armour and Company of *Illinois* in *South Carolina,* of *Delaware* in *Georgia,* and of *Maine* in *North Carolina.* Reported cases from other Courts disclose even other corporations of the same name of Armour & Company. For instance see the Ohio case of *Kniess v. Armour & Company,* 134 Ohio St., 432, 17 N. E. (2d), 734, 119 A. L. R., 1348, where the defendant was a *Kentucky* corporation.

Appellant's questions will be discussed in the order in which they are stated on page one of the excellent brief.

The first is to the effect that there was insufficient evidence tending to connect the unfitness of the ham with negligent conduct of, or establish violation of the State Pure Food and Drug Act by, Armour & Company of Illinois, the appellant, or any other "Armour" corporation.

As there will have to be a new trial of the action, we shall make no additional references to the evidence adduced at the former trial other than may be necessary for the purpose of the discussion of the question made; suffice it to say that in our view there was sufficient testimony to require the submission thereof to the jury upon the issue of whether the defendant was the processor, in this case the equivalent of the manufacturer, of the ham; and likewise that there was ample testimony from which negligence in such processing and handling could have been reasonably inferred.

There was evidence of more than mere illness of the plaintiff after eating the ham, to wit, of its discolored and soft condition and that all who ate it were similarly affected and none who ate in the same restaurant on the same day and did not eat of the ham was

made ill and the further symptoms of those who became sick that it was the result of the ham, all this in addition to medical testimony of diagnosis of food-poisoning. Incidentally, it is well settled that government inspection is not a substitute for due care. 22 A. J., 894, and cases cited in footnote.

As was said by this Court in an early case upon the general subject of the liability here involved, *Tate v. Mauldin,* 157 S. C., 392, 154 S. E., 431, 434, "under the decisions of this court, negligence may be established by not only positive evidence, but by circumstantial evidence as well. *Sanders v. Charleston & W. C. R. Co.,* 147 S. C., 487, 145 S. E., 400; *Hopkins v. Southern Cotton Oil Co.,* 144 S. C., 395, 142 S. E., 615."

In *Hollis v. Armour & Company,* 190 S. C., 170, 2 S. E., (2d), 681, a verdict for plaintiff was upheld upon the ground that negligence may be established not only by direct, but also by circumstantial evidence; and it was pointed out that whether the contamination in the food there involved came about after defendant had delivered it was a question for the jury under the evidence and that as every such case must be decided under its own peculiar facts, former pertinent decisions are rarely found to be helpful.

Appellant cites certain other cases from this Court in which the State Pure Food law was unquestionably applicable, there being involved the manufacture or sale of adulterated food or drink, as there defined, within the boundaries of the State. In such cases proof of common-law negligence' was unnecessary because of the established rule that violation of the statute is *per se* negligence, hence where there was evidence of such violation there was no necessary question on defendant's appeal of whether there was sufficient evidence of common-law negligence to take the case to the jury.

Comparison of the facts of those cases with those evidenced by the testimony here will throw no light on the present problem for this case is the converse

of the other cases referred to, or the most of them. Like them, this case was submitted to the jury upon two theories of liability, violation of the State statute and common-law negligence. Granting appellant's contention that the statute is not applicable to the case made below, we find and hold that there was evidence from which the jury could have reasonably inferred negligence in the selection, processing, handling and inspection of the meat; and this without resort to the doctrine of *res ipsa loquitur* which is not of force in the Courts of this State.

*Delk v. Liggett & Myers Tobacco Co.,* 180 S. C., 436, 186 S. E., 383, was a case involving a tack in a plug of chewing tobacco not within the Pure Food Act but held by this Court to be within the general class of food and drink cases insofar as negligence of the manufacturer raises a liability to the ultimate consumer who is injured thereby; verdict was directed for the defendant only on facts not present here, principally the time and opportunity resulting from the carrying of the tobacco in plaintiff's pocket for the tack to have there gotten into the tobacco; it was said in effect that negligence may be found on the part of the manufacturer where the evidence tends to show that impurities were added during the manufacture or that there was negligence in the inspection of the product.

*Hunter v. Allied Mills,* 184 S. C., 330, 192 S. E., 256, is in point. In that case there was evidence, less strong we think than was the corresponding evidence in this case, tending to establish that the sickness and death of plaintiff's valuable dogs were caused by the use of prepared food manufactured by the defendant and it was held that whether the injury resulted from the negligence of the manufacturer was for the jury, and verdict for the plaintiff was sustained.

There are numerous annotations of many cases upon this subject in A. L. R., which may be found by reference to the indices. From 17 A. L. R., at page 688 we quote the following: "The decided weight of authority is to the effect that an ultimate consumer may bring an action directly

against a negligent manufacturer or packer   *   *   *." Review of the annotations will show, we think, that our disposition of this question is in line with the better authorities found in other jurisdictions.

Reference to this first question of appellant anticipates the second question, which latter imputes error to the trial Judge in instructing the jury as to the provisions of the State "Pure Food and Drug Act" (Section 1452 of the Code of 1932) and in refusing to charge that it was inapplicable.

We are constrained to hold that this question is well taken and that the exception thereabout should be sustained. The Act makes it unlawful to manufacture or sell or offer for sale any article of food adulterated, etc., within the definitions of the Act. We know of no reason why it could be held to be an exception to the ordinary rule that it is restricted in its effect to the territory of the State. 25 R. C. L., 781. The Court's instruction of the jury that the State statute was applicable to the manufacture and sale by the defendant of the ham and that a violation of the statute by the defendant would constitute negligence *per se* was unwarranted and prejudicial to the defendant, on which account a new trial should be had.

Appellant's third question charges error in refusing to direct the verdict for it upon the ground that there was no evidence of connection with the matter of Armour & Company, an Illinois corporation.

The general statement above in reference to the first question as to the sufficiency of plaintiff's evidence disposes of this question. It may be added that the testimony of one of the defendant's witnesses to the effect that the products of the various Armour & Company plants were shipped back and forth among them and the evidence that there was attached to the ham the tag of "Armour & Company, Chicago, Illinois," were enough, in our opinion, for the jury to have reasonably found that this product was that of the defendant in this action.

It is urged in the fourth· question that the trial Court erred in ˉsubmitting the case to the jury as one upon the common law and also under the Pure Food Act.

What has been said with reference to the prior questions indicates our conclusion upon this. It was error to submit the case to the jury under the State Pure Food Act, but upon the testimony it was properly so submitted upon common-law negligence. The quoted portion of the complaint contains a sufficient general charge of negligence on the part of the defendant of which defendant's answer made an issue, submissible to the jury under proper instructions. There was no motion to make the complaint more definite.

The fifth and final question charges error in the examination of plaintiff's witness, Dr. Lewis, on the subject of hog cholera.

All of the testimony of this witness to which defendant objected was finally ruled incompetent by the trial Judge and he instructed the jury to disregard the relatively small amount which had been previously admitted over. objection. No prejudicial error is disclosed by the record. Incidentally, if this witness is offered on another trial of the case, plaintiff's counsel will be better acquainted with the witness' qualifications and knowledge and there will be no occasion for questions as to which the witness is unable to testify.

For the reasons indicated all exceptions are overruled save VI, which is sustained; the judgment below is reversed and the case remanded to the Richland County Court for a new trial.

Mr. Chief Justice Bonham, Messrs. Justices Baker and Fishburne and Mr. Acting Associate Justice L. D. Lide concur.