16959

MARION D. HICKLIN and MELBA H. HICKLIN, Administrators of the Estate of Rich Wallace Hicklin, deceased, Respondents, v. JEFF HUNT MACHINERY COMPANY, Appellant

(85 S. E. (2d) 739)

*Messrs. Graydon & Graydon* and *Herbert & Dial,* of Columbia, *for Appellant,*

*Messrs. Robinson, Robinson & Dreher,* of Columbia, *for Respondents,*

February 7, 1955.

OXNER, Justice.

This action was brought to recover damages for the alleged wrongful death of a four year old child. The trial resulted in a verdict for the plaintiffs in the sum of $30,000.00

actual damages. The sole question presented by this appeal, which was duly raised in the Court below by timely motions for nonsuit and directed verdict, is whether there is any evidence of actionable negligence on the part of appellant, defendant below.

The death of respondents' intestate, Rich Wallace Hicklin, resulted from a most unusual occurrence. On the afternoon of March 16, 1953, Mr. and Mrs. Hicklin and their son, Rich, were returning from Augusta, Georgia, to their home in Columbia. Mr. Hicklin was driving, with his wife sitting beside him. The boy was on the rear seat. Between 5:00 and 6:00 o'clock that afternoon as they approached Congaree Creek, about eight miles south of Columbia, on State Highway No. 215, Mr. Hicklin observed meeting him a truck and trailer loaded with a heavy piece of machinery the width of which projected beyond the trailer body. To avoid passing this truck and trailer on the Congaree Creek bridge, he reduced his speed from 50 or 55 miles an hour to about 40. As the truck and trailer passed over the bridge, a sheave or pulley, weighing about eleven pounds and about the size of a small plate, dropped off the machinery, hit the asphalt pavement on the rim, and after bouncing on the pavement several times, crashed through the windshield of the Hicklin car near the right-hand post, narrowly missing Mrs. Hicklin, and struck the head of the child, crushing his skull. The Hicklin car had not yet reached the bridge. On account of the impact, Mr. Hicklin encountered difficulty in controlling his car. He was able, however, to drive it across the bridge, stopping on the shoulder of the road on the Columbia side. After finding that the boy was seriously injured, he accepted the offer of a passing motorist to drive his car to the hospital. On arrival, the boy was pronounced dead.

The trailer, known as a "lowboy", was loaded with a D-8 Caterpillar tractor equipped with a Le Tourneau angle dozer, all of which weighed about 22 tons. This tractor and dozer belonged to the Federal Government and were turned over

to appellant in November, 1952, for overhauling and repairs. The work was completed during the latter part of February, 1953. The machinery had been field-tested and except for painting, was ready for delivery. On the afternoon of the accident, the Government tractor was being hauled from appellant's shop in Columbia to its place of business in Lexington County, a distance of about ten miles, for the purpose of pulling out one of appellant's tractors which had gotten stuck. The sheave which dropped to the roadbed of the bridge with such tragic effect came off this angle dozer.

The foregoing facts are not in dispute. Appellant does not claim that there was any contributory negligence on the part of either Mr. or Mrs. Hicklin. Nor does it assert that the accident resulted from some intervening cause. It admits that the death of this child resulted from the falling of a wheel or sheave from the dozer, but denies any negligence on its part. It alleges that "through a latent defect, probably in a cotter pin which gave away, the sheave or wheel was released and fell from the vehicle and, after bouncing or rolling on the highway, caused the injury alleged", all of which it says could not have been foreseen or avoided.

Counsel for appellant in their brief say: "Somewhere on the trip a steel cotter pin for some unexplained reason gave way and released a shaft which in turn released two steel pulley wheels." Counsel for respondents deny that there is any proof that there was a break in the cotter pin *en route*. They argue that the evidence reasonably warrants the inference that when the dozer left the shop the cotter pin was either not in place or was in a defective condition.

Cables on the sheaves of the dozer operate to raise and lower the 40-inch bulldozer blade, weighing about 2,000 pounds. They are on a shaft held in place by a cotter pin, which is about the size of a lead pencil. It is necessary for the cotter pin to be out for the shaft and sheaves to fall.

There were two sheaves on this shaft. Some time after the accident, one sheave and the shaft were found in the lowboy. Although a diligent search was made, the cotter pin was never located.

The complaint contains numerous allegations of negligence. Some of them, as held by the trial Judge, clearly had no causal connection with the accident. However, we think the evidence warrants an inference of actionable negligence in several particulars.

We shall first discuss the question of negligent repair. The Government prepared and turned over to appellant a job order, dated November 3, 1952, which gave detailed specifications of the work to be done. With reference to the sheave blocks it provided: "Disassemble and clean. Build up bolt hole. Replace bolts and nuts." Under the remarks on this order it was stated that after an operational test and inspection, the tractor "was found to require major repairs to *all* component parts due to rust and normal wear and tear." (Italics ours.) Appellant's service manager testified that "deterioration from rust had set in to a considerable extent."

The evidence shows that this sheave block was disassembled and in doing so, it was necessary to remove the cotter pin and in reassembling, to replace it. All of this had a tendency to weaken it. Appellants' service manager testified:

"A. You see how this cotter pin is made: It is one piece of metal bent around, and with one end a little longer than the other. When you install the cotter pin in a shaft, you compress the cotter pin, and stick it in there, and then, of course, you take a punch, or some article you can strike with a hammer, and put it against that (indicating), and bend this cotter pin—bend this half back to some angle like that (indicating), and that keeps your cotter pin from dropping out.

"Q. Now, is that the reason why this end (indicating) of the cotter pin is longer than the other end? A. Yes, sir.

"Q. So it can be bent back readily? A. Yes, sir, and if you want to remove it, you take a hammer and hammer these (indicating) back together to where you can drive it out and take it out. Does that answer the question?

"Q. Yes, sir. What, then, Mr. Brice, could cause the cotter pin to come out? A. The only thing I know that could cause it would be for one leg to break off.

\* \* \* \* \*

"Q. In taking this assembly down would it have been necessary to take out the cotter pin? A. Yes, sir.

"Q. Did you put the same cotter pin back in or put a new one in? A. I can't answer that of my own knowledge. All I can say is, according to the records of the job, a new cotter pin wasn't purchased for it.

"Q. Would that indicate that the old cotter pin had been put back in? A. That's correct.

"Q. You don't know how long that old cotter pin had been used, do you? A. No, sir.

"Q. Is the cotter pin weakened when you prize it apart and then knock it back together? A. I would assume that it is.

"Q. You would assume that it is? A. Yes, sir.

"Q. And so the more times you open it and put it back together, the weaker the cotter pin gets? A. That would be the assumption.

"Q. And according to your records, when this tractor was at your plant, this cotter pin was taken out? A. It was.

"Q. And in doing that it had to be straightened back to this one's present shape? A. That's correct.

"Q. And according to your records, they show the same cotter pin was put back in? A. As directed by the Government inspector. He is the man who says what to re-use and what to replace as new.

"Q. You don't use any independent judgment on that? A. That's his responsibility.

"Q. Did you inspect this particular cotter pin to see if it had been bent back and forward too many times? A. I did not.

"Q. And so the one that was taken out and bent back straight, according to your records, is the one that was put back in? A. There are no records that indicate that a new one was purchased.

\* \* \* \* \*

"The Court: I don't think he asked him what could cause a cotter pin to break.

"The Witness: A defect in the metal, a sandspot in the casting when it was poured, the repeated re-use of a cotter pin which would set up a weakness inside that wouldn't be visible from the outside, but under shock could cause it to break, and a very severe strain on turning of sufficient strength to shear it would shear it completely off. Those are three things that could cause the failure of a cotter pin."

One of appellant's mechanics testified:

"Q. If it's (the cotter pin) in there and has been spread and comes out, what could cause it to come out? A. Well, the cotter pin could be a defective cotter pin, have an air hole in it or it could crystallize, or it could be just plain worn out."

The witness who could have thrown more light than any other on the situation was the mechanic who disassembled and reassembled the sheave block. Doubtless he could have testified positively as to the condition of the cotter pin and whether it was replaced when the sheave block was reassembled. But none of the mechanics who actually did the work were called as witnesses. The unexplained failure of appellant to call them warrants the inference that their testimony if presented, would have been unfavorable to its theory of the cause of the accident. *Wingate v. Postal Telegraph & Cable Co.*, 204 S. C. 520, 30 S. E. (2d) 307; *Robinson v. Duke Power Co.*, 213 S. C.

185, 48 S. E. (2d) 808; *Padgett v. Southern Railway Co.,* 216 S. C. 487, 58 S. E. (2d) 895.

It is well settled that negligence may be established by circumstantial evidence as well as direct evidence, and that in a civil case the law does not require proof to a certainty. *Eickhoff v. Beard-Laney, Inc.,* 199 S. C. 500, 20 S. E. (2d), 153, 141 A. L. R. 1010. We think the circumstances reasonably warrant the inference either that the cotter pin was not in place when the machine left the shop or was in a defective condition and should not have been used. Negligence in causing the fall of the sheave could be based on either fact.

As heretofore pointed out, the sheave which killed this child came off the assembly block. All other parts of the block except the cotter pin were found in the body of the "lowboy". Although a diligent search was made, no one was ever able to find the cotter pin or any part thereof. These circumstances justify an inference that the cotter pin was never replaced when the block was reassembled. It is true that the service manager testified that he "casually" looked at the dozer after it was loaded for this trip and noticed that the cotter pin was in the shaft, but the credibility of this testimony was for the jury.

The testimony of appellant was to the effect that the failure of the cotter pin could have resulted from "repeated re-use", or "it could be just plain worn out." Before this machine was turned over to appellant for repairs, a government inspection disclosed that due to "rust and normal wear and tear", major repairs "to all component parts" were required. It further appears that removing and replacing the cotter pin tends to weaken it. The jury could have reasonably concluded that a new cotter pin should have been used and that the failure to do so caused the sheave to fall.

We have not overlooked the testimony that several other things could have caused the cotter pin to come out. But

"the fact that an injury may have been caused in one of two or more ways does not preclude recovery, if the facts and circumstance in evidence warrant a reasonable inference that it was caused in any way alleged in the complaint for which the defendant would be liable." *Browder v. Southern Railway Co.,* S. C., 83 S. E. (2d) 455, 460. It is sufficient if the evidence tends to sustain the reasonable probability of the one relied on. *Hill v. Polar Pantries,* 219 S. C. 263, 64 S. E. (2d) 885, 25 A. L. R. (2d) 1080; *Barnwell v. Elliott,* 225 S. C. 62, 80 S. E. (2d) 748; *Odom v. Weathersbee,* 225 S. C. 253, 81 S. E. (2d) 788.

Appellant says that this accident was so unusual "as to be almost fantastic", and that no one could have foreseen this "million-to-one accident". But, to establish liability, it is not necessary that appellant should have contemplated the particular event which occurred. It is sufficient that it should have foreseen that its negligence would probably result in injury of some kind to someone. The wrongdoer may be held liable for anything which, after the injury is complete, appears to have been a natural and probable consequence of his negligence. *Tobias v. Carolina Power & Light Co.,* 190 S. C. 181, 2 S. E. (2d) 686; *Culbertson v. Johnson Motor Lines, Inc.,* S. C., 83 S. E. (2d) 338.

Appellant lays great stress upon the fact that the work was done strictly in accordance with the Government order and had been approved by the Government inspectors. Assuming this to be true, it does not follow that appellant is relieved of liability. This is not an action by the Government for damages on account of negligent repair. The machine was not even being used on Government business at the time of the accident. As heretofore stated, appellant was taking it to its place of business in Lexington County for the purpose of pulling out one of its tractors that had bogged down. If appellant knew, or in the exercise of ordinary care should have known, that this dozer was not in a condition to be safely hauled on this highway, it must assume the risk of damages caused to third parties. Our

statutes prohibit the driving of any vehicle on the highway unless the load is securely fastened so as to prevent any part thereof from dropping, becoming loose or detached, or otherwise constituting a hazard to other users of the highway. Secs. 46-660 and 46-661 of the 1952 Code.

There is further evidence of negligence in that the tractor-trailer was being driven at an excessive rate of speed. Two ladies testified that they were in a Lincoln automobile which followed, but never passed, this trailer from the Columbia Airport to the site of the accident, a distance of approximately two miles, and that the speedometer on the car in which they were riding showed that it was being driven at a rate of 70 miles an hour. Counsel for appellant characterizes this testimony as unworthy of belief. While there is other evidence strongly tending to show that appellant's vehicle was not being driven in excess of 50 miles an hour, the credibility of the testimony of these ladies was for the jury. But even if we accept the statement given by the driver of this tractor-trailer that he was traveling at the rate of 45 or 50 miles an hour, negligence could be inferred in hauling this heavy load of 22 tons on a "lowboy", which had no springs, at this rate of speed. In addition to these circumstances, the blade of the dozer was 13 feet wide and protruded 2 1/2 feet on each side of the trailer and as the vehicle approached the Congaree bridge, it was going down a slight incline. It is argued that any negligence in this respect could not have been a contributory cause of the accident. But we think the jury could have inferred that the rate of speed added to the momentum of the falling sheave and occupied a relation of cause and effect.

There is also testimony tending to show that appellant knew for some reason that it was not safe to transport this tractor-bulldozer along the highway. Shortly after the accident the driver of the trailer-tractor returned to the scene. When told that the falling sheave had killed a child, he remarked, according to one of the witnesses: "My God I told them it wasn't safe, and they said, 'Go on, and we will take

the risk.' " Another witness said he stated: "I shouldn't have brought it out, but they told me to go ahead, they would take the risk." The person who brought the driver back to the scene of the accident testified that he heard him (the driver) say "something about the way it was loaded".

We are asked to reject the above testimony relating to the remarks of the driver as "utter untruths". But we are not given this prerogative. It belongs to the jury.

Appellant calls our attention to the fact that this Court has never adopted the doctrine of *res ipsa loquitur* and says that under our decisions the mere breaking or giving way of machinery or an appliance in itself is not sufficient to support an inference of negligence, citing *Green v. Southern Railway Co.*, 72 S. C. 398, 52 S. E. 45; *Watson v. Charleston Stevedoring Co.*, 141 S. C. 355, 139 S. E. 778, and *Weston v. Hillyer*, 160 S. C. 541, 159 S. E. 390. But these cases and others of like effect are distinguishable in that here, as we have endeavored to point out, there is evidence that the falling of the sheave was due to the negligence of appellant.

Judgment affirmed.

BAKER, C. J., and STUKES, TAYLOR, and LEGGE, JJ., concur.