## 16990

JOSHUA T. TURNER, Respondent, v. W. H. WILSON, d/b/a
WILSON SANDWICH COMPANY, Appellant

(86 S. E. (2d) 867)

96

*Messrs. Ansel M. Hawkins,* of Greer, and *Williams & Henry,* of Greenville, *for Appellant,*

*Sol. E. Abrams, Esq.,* of Greenville, *for Respondent,*

April 12, 1955.

OXNER, Justice.

Plaintiff seeks to recover for the effects of an illness al-
leged to have been caused by eating a deviled egg sandwich
purchased from a retailer to whom this sandwich had been
sold by the defendant. The action is based on negligence in
selling unwholesome food. The answer was a general denial.
The trial resulted in a $750.00 verdict for plaintiff. From
the judgment entered thereon, the defendant has appealed.
His principal contention is that the Court erred in not
granting a motion for a directed verdict upon the ground
that there was no proof of actionable negligence.

Defendant makes and sells at wholesale various kinds of
sandwiches. He has been engaged in this business since 1923.
The plant is located in the basement of his home in the
Town of Greer. About twelve Negroes are employed and
the daily production is around 3,000 sandwiches, which are
sold at various places in that vicinity. The sandwiches are
made and wrapped in the morning and on the same day
delivered in boxes to the retailer. The following morning
those not sold are taken up, and fresh sandwiches delivered.
Among defendant's customers are retailers who sell this
food to employees in the textile plants by use of a "dope
wagon," which is a cart loaded with sandwiches and other
food, together with coffee and soft drinks, and pushed
through the mill.

Plaintiff worked on the third shift at Appalache Mill in Greenville County. On Friday, June 20, 1952, he commenced work as usual at midnight. Shortly after one o'clock he purchased from the dope wagon a deviled egg sandwich made by defendant, a barbecue sandwich and a Coca-Cola. It was his custom to buy food from this wagon and eat at that time. About an hour later he suffered severe nausea and abdominal pain. Several hours thereafter he was taken to his home where he was examined by a physician who directed that he be removed to the hospital. He remained at the hospital for a day and night, after which he returned home. It was about ten days before he was able to go back to work. He had had no previous stomach disorder and his last meal before going to work was at home about 2:30 the preceding afternoon.

On the same night that plaintiff became ill, twelve or fifteen other persons who had eaten deviled egg sandwiches made by defendant suffered similarly and were taken to the hospital. An employee of the Victor Mill, who worked on the third shift, testified that about 4:30 a. m. he bought from the dope wagon one of defendant's deviled egg sandwiches, a bottle of milk and a Coca-Cola. Several hours later he became violently ill and was taken to the hospital. Another employee working on the third shift at the Victor Plant said that about 4:30 a. m., she bought from the dope wagon a deviled egg sandwich and a Coca-Cola and about twenty minutes later became "deathly ill." An employee of the same plant, who worked on the second shift, stated that about eight o'clock that night she bought one of defendant's deviled egg sandwiches, potato chips and a glass of milk. Her illness commenced about an hour later. The testimony of an employee of the Greer Mill, who worked on the third shift, was to the effect that on the night in question, at about 1:30 a. m., he bought from the dope wagon a deviled egg sandwich made by defendant, a cup of coffee and a small cake. His illness commenced about two hours later and he was taken to the hospital. Plaintiff's wife,

who worked on the third shift at the Appalachee Plant, said that on this night she saw another employee purchase a sandwich and that after eating "about two bites," said employee took the sandwich back and bought something else.

The foregoing contains in substance the testimony offered by plaintiff. It will be observed that these witnesses worked at three different mills; that on the night in question the only article of food eaten in common by all of them was a deviled egg sandwich made by defendant; and that shortly after eating same, each suffered similarly with nausea and abdominal pains and was treated at the hospital for food poisoning.

Defendant described in detail the manner in which his plant was operated, which tended to show due care in maintaining sanitary conditions and using standard ingredients. He said that this was his first complaint since commencing business in 1923. He testified that the sandwiches complained of were made along with about 1,800 other deviled egg sandwiches "out of the same batch," and that the only other complaints he had were from the ten or twelve who were treated for food poisoning that night. He said that if the sandwiches eaten by plaintiff and others were contaminated, they must have become so after they left his control.

Defendant further testified as follows:

"Q. You gave them (the retailers) no instructions with your sandwiches, you just sell them? A. No, sir, I can't tell a man what to do.

"Q. In any manner keep your sandwiches and sell them in a normal amount of time they should be all right? A. That is right.

\* \* \*

"Q. What margin do you average—how long will they (the sandwiches) go before they will be bad? A. I don't let them go over twenty-four hours.

"Q. How long before they turn bad? A. No one can tell that.

"Q. What is the minimum safe time to eat them? A. I would say twenty-four hours."

It seems to be undisputed that the defendant's plant was regularly inspected by the State Board of Health and by the health authorities of the Town of Greer. He was given an "A" rating. An operator of a drugstore testified that he had handled the defendant's sandwiches for a period of 22 years without a complaint. The proprietor of another drugstore testified that he had sold defendant's sandwiches for a period of 25 years and had heard no complaint.

The mere fact that plaintiff became ill after eating this sandwich does not necessarily show that it was unwholesome. He ate other food at the same time. But, as heretofore pointed out, the only item of food eaten in common by those poisoned on the night in question was a deviled egg sandwich made by defendant, and all suffered a like illness in close proximity to eating this food. From these circumstances, it could be reasonably concluded that the deviled egg sandwiches were unwholesome. "When, under the same conditions, several persons who have eaten the same food become similarly ill an inference may be warranted that the food which all had eaten was unwholesome and was the cause of their illness." *Johnson v. Kanavos,* 296 Mass. 373, 6 N. E. (2d) 434, 436. Testimony of this character was given weighty consideration in *Hollis v. Armour & Co.,* 190 S. C. 170, 2 S. E. (2d) 681; and *Boylston v. Armour & Co.,* 196 S. C. 1, 12 S. E. (2d) 34.

A more difficult question is whether there is any evidence tending to show that these sandwiches were contaminated or tainted when they left the possession of defendant. On this the record is meager and the evidence wholly circumstantial. There was no effort by defendant or anyone else to have made a bacterial or chemical analysis of these deviled egg sandwiches. None of those

who sold them testified. The record is silent as to the manner in which this food was handled after being delivered to the retailers at the mills. The weather was warm, defendant said "unusually hot," but we are not advised of the temperature inside the plants. If all of those becoming ill had worked in the same mill, it might be plausibly argued that the unwholesome condition of the food could with equal likelihood be the result of external causes operating thereon after the sandwiches had left defendant's control. But they worked at different mills, in one of which there was a different retailer. It would be rather singular if these sandwiches were improperly handled or cared for in all three mills on the same night. Then, too, there is no evidence that any of the mill employees had previously been made ill from eating sandwiches. Although the question is a close one, we think the circumstances are strong enough to show a reasonable probability that this food was unwholesome when sold by defendant. Under our rule of circumstantial evidence, this is sufficient. *Hicklin v. Jeff Hunt Machinery Co.*, S. C., 85 S. E. (2d) 739, and cases therein cited.

If, as we have held, there was evidence of the fact that the defendant sold unwholesome food, there was no error in refusing the motion for directed verdict. Under our decisions proof of the violation of the Pure Food Act, Section 32-1511 *et seq.* of the 1952 Code, makes but a *prima facie* case of negligence. *Gantt v. Columbia Coca-Cola Bottling Co.*, 193 S. C. 51, 7 S. E. (2d) 641, 127 A. L. R. 1185. Among the later decisions so holding are: *Tedder v. Coca-Cola Bottling Co.*, 224 S. C. 46, 77 S. E. (2d) 293; *Peters v. Double Cola Bottling Co.*, 224 S. C. 437, 79 S. E. (2d) 710. It is argued that this statute is inapplicable. We do not agree. *Hollis v. Armour & Co., supra*, 190 S. C. 170, 2 S. E. (2d) 681. The meaning and purpose of our Pure Food Statute are discussed at length in *McKenzie v. Peoples Baking Co.*, 205 S. C. 149, 31 S. E. (2d) 154.

In further support of our conclusion that the evidence required submission of the case to the jury, see *Hunter v. Allied Mills, Inc.,* 184 S. C. 330, 192 S. E. 356; *Boylston v. Armour & Co., supra,* 196 S. C. 1, 12 S. E. (2d) 34; Annotation in 49 A. L. R., page 592.

The remaining exceptions relate to the admissibility of testimony. After one of the witnesses who worked at the Greer Mill had testified that he became ill on the night in question about two hours after he had eaten one of defendant's deviled egg sandwiches, he was asked on cross-examination by defendant's counsel whether he had made any claim against the person who sold this food. He denied doing so, but admitted that "through the mill" he was paid "some money" and released the seller. When plaintiff's counsel sought on redirect examination to go into the circumstances surrounding this release, the trial Judge sustained an objection by defendant's counsel and on his own volition struck out all testimony relating to the release upon the ground that it was irrelevant. It is contended that the Court erred in doing so because the testimony stricken related to the credibility of the witness and was inconsistent with the testimony which he had previously given. We find no error, and certainly no prejudicial one. This witness merely stated that he became sick after eating this food, but did not undertake to place liability on defendant or anyone else. We are unable to see how the testimony stricken had any bearing on his credibility or tended in any way to contradict his previous testimony.

Over objections of defendant's counsel, plaintiff was permitted to testify that when he arrived at the hospital, one of the nurses who put him to bed remarked: "I guess this is another of those deviled egg sandwiches." The Court concluded that this testimony was a part of the *res gestae.* The error, if any, in the admission of this testimony was not prejudicial. Testimony as to similar remarks made by others was received without objection. Just prior

to the testimony complained of, plaintiff had testified without objection as follows:

"Q. When they took you home what happened? A. My daughter called the doctor and he says carry him on to the hospital, I guess he is like the rest of them, he is poisoned on sandwiches."

Defendant himself said several persons had complained to him about his deviled egg sandwiches. He further testified:

"Q. Who contacted you about your food products immediately after about your sandwiches? A. I had no contact.

"Q. Nobody, City or Doctor, called up? A. Yes, sir, one doctor called me and said he had trouble on it, and had a few in the hospital in regard to it.

"Q. He told you it was deviled egg sandwiches? A. I don't know that he said.

"Q. He told you it was your sandwiches? A. Yes, sir.

"Q. You accepted that as such? A. Yes, sir.

"Q. You had no reason not to believe the doctor? A. I didn't question him."

All objections are overruled and the judgment below affirmed.

BAKER, C. J., and STUKES, TAYLOR and LEGGE, JJ., concur.