**422**

James F. COX, Jr., Plaintiff,

v.

**AMERICAN GUARANTEE AND LIA-
BILITY INSURANCE COMPANY,
a Corporation, Defendant.**

Civ. A. No. 5640.

United States District Court
E. D. South Carolina,
Charleston Division.

Oct. 2, 1957.

Pritchard & Myers, Charleston, S. C., for plaintiff.

Ben Scott Whaley, Barnwell, Whaley & Stevenson, Charleston, S. C., for defendant.

WYCHE, District Judge. (sitting by designation).

This action was brought to recover the sum of $5,000, which the plaintiff claims is due him under a safe-burglary insurance policy issued by the defendant.

In compliance with Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A., I find the facts specially and state my conclusions of law thereon, in the above case, as follows:

### Findings of Fact

1. Prior to October 4, 1955, and subsequent thereto, the plaintiff was engaged in a Pool Parlor and news-stand business at 363 King Street, in the City of Charleston, known as the M & M Recreation Center, where pin-ball machines were operated, beer was sold, and wagers were taken on various sporting and athletic events.

2. On October 4, 1955, plaintiff procured from the defendant a $5,000 safe-burglary insurance policy for a period of one year and paid the premium thereon.

3. On January 7, 1956, while the policy of insurance was in force, plaintiff reported to the representatives of the defendant that his safe had been burglarized and that an amount in excess of $5,000 had been taken therefrom.

4. On the same date plaintiff also reported to the Police Department of the City of Charleston that his safe had been burglarized; the police officers visited plaintiff's place of business on January 7, 1956, and found the safe doors open and personal papers and small change on the floor, three cash boxes ripped open and left near the safe, the safe drilled through the number "50" on the dial with a hole approximately ¼ inch in diameter and a small piece of bent wire was lying on the floor in front of the safe; the safe was a distance of 200 to

210 feet from its customary position; there were no markings on the floor where it had been moved on its rollers; it would have taken four or five men to carry the safe, it could have been moved by a truck which was in the building. The police officers found that the inner door of the safe apparently had not been locked, or if locked, had been opened with a key. They saw no indications that the inner lock had been "picked" or tampered with. They found the back door to the building had been broken open from the inside; they found no physical signs of an entry to the building from the outside.

5. The safe was about 36 inches high, 22 inches wide and weighed about 350 pounds. It had a combination dial lock with the handle operating as part of the dial on the outer door. Inside the safe was an inner steel door which could be locked with a key.

6. Immediately after the police officers arrived they summoned a safe expert who was unable to open the safe through the drilled hole. The safe was also inspected by an expert who handles safe-repair work for various banks and is an authority in the field of repairing and opening safes. He was unable to open the safe through the drilled hole.

7. Plaintiff customarily made nightly inspections of his premises. He found nothing to indicate that any person was in his building when he "closed up" about midnight of January 6, 1956.

8. Plaintiff lived directly above his business and his household consisted of himself, and his wife, his mother-in-law, brother-in-law and stepson, a dog and two monkeys. None of the household was awakened during the night of the alleged burglary.

9. On the morning of January 7, 1956, an investigator for the insurance company met with the plaintiff to discuss his claim. At that time the plaintiff signed a written statement in which, among other things, he said: *"I had been accumulating the $4,200.00 since about July of 1955* and *the purpose of ac-cumulating the money* was to pay my landlord up to date and in advance of about three (3) months so that I could secure a long term lease from him. Since *July of 1955*, I would put money in an envelope or envelopes *from time to time gradually increasing the amounts. I do not have any record of the fact that I had the $4,200.00 other than the notations on the two envelopes. In other words, there was nothing written in my books or store records to indicate that I had the $4,200.00.* The Charleston News Company, through *a Mr. McInnes,* the owner, has been helping me out financially such as giving me credit to a considerable extent and he was aware of my purpose *in saving the money* and *he knew approximately how much* I had in the safe for I kept him informed of my progress *in saving the money."* (Emphasis added.) At the time he gave the written statement, plaintiff did not produce any books or records to substantiate his claim for the loss; in his written statement he did not say that he had obtained $5,000 cash from Mr. Marr and given his note for it, or that he had put the $5,000 in his safe.

At the trial the plaintiff claimed that he had an agreement with his landlord to lease the building to him provided he paid $4,800 back rent, and provided an option to lease the property to another party was not exercised by January 10, 1956; that on September 24, 1955, he secured $5,000 cash from Billy Marr of Norfolk, Virginia, to hold until January 10, 1956, to pay the back rent and secure the lease, if it was not leased to another on that date. He said he gave his note for the $5,000 which he signed in the presence of a notary; he stated if he did not get the lease the $5,000 was to be returned to Billy Marr; that upon the advice of his former attorney he put the $5,000 in the safe and had it insured by the defendant against burglary. At the trial plaintiff introduced in evidence two books, which he claims constituted his records to prove his claim, one of which on page 150 in the back of the book, contained the following: "1955

Sept. From Bill Marr 5000.00" and some other entries, some in ink and some in pencil, totalling $5,815.00.

10. Plaintiff offered no testimony to corroborate his transactions with Billy Marr, or his landlord, or with his former attorney, or Mr. McInnes of the Charleston News Company, nor did he produce the note he claims he gave to Marr, or the notary who he says witnessed his signature to the note.

11. The plaintiff carried a regular bank account but he claimed that he did not wish to put the $5,000 in the bank because he had other creditors than his landlord.

## Conclusions of Law

1. The policy of insurance indemnifies the insured "(a) For all loss by burglary which shall mean the felonious abstraction of any such insured property from within the insured part, * * * of the safe * * * by any person or persons making felonious entry into such safe and such insured part thereof * * * containing such safe when all doors of such safe * * * are duly closed and locked by all combination * * *, provided that such entry shall be made by actual force and violence of which there shall be visible marks made by tools, * * * upon the exterior of (1) all of said doors of such safe and of the insured part thereof * * *, if entry is made through such doors. * * *."

 2. Plaintiff failed to prove the material allegations of his complaint by the greater weight or preponderance of the evidence; he failed to produce the testimony of available witnesses to corroborate his testimony on material issues in the case, and it may be inferred that their testimony, if presented, would have been adverse to the plaintiff. Wingate v. Postal Telegraph & Cable Co., 204 S.C. 520, 30 S.E.2d 307; Robinson v. Duke Power Co., 213 S.C. 185, 48 S.E. 2d 808; Padgett v. Southern Railway Co., 216 S.C. 487, 58 S.E.2d 895; Hicklin v. Jeff Hunt Machinery Co., 226 S.C. 484, 85 S.E.2d 739. Furthermore, plaintiff's testimony at the trial was in direct conflict in some material respects to the written statement he gave the investigating agent of the defendant on the date of the alleged burglary.

3. The policy of insurance provides also "C. Exclusions. The company shall not be liable for loss or damage: (1) unless records are kept by the insured in such manner that the company can accurately determine therefrom the amount of loss; * * *."

4. Plaintiff failed to keep records in such a manner that the defendant could accurately determine therefrom the amount of the loss. Evans v. Century Insurance Co., 201 S.C. 273, 22 S.E.2d 877; Crowley v. North British Mercantile Insurance Co., D.C.S.C., 70 F.Supp. 547, affirmed 4 Cir., 164 F.2d 550; Clark & Jones, Inc., v. American Mutual Liability Insurance Co., D.C., 129 F.Supp. 282.

For the foregoing reasons, it is my opinion that judgment should be for the defendant.

It is, therefore, ordered, adjudged and decreed, that judgment be entered in favor of the defendant.