15640

WINGATE v. POSTAL TELEGRAPH & CABLE COMPANY

(30 S. E. (2d), 307)

November, 1942.

*Messrs. Hagood, Rivers & Young,* of Charleston, S. C., Counsel for Appellant,

*Mr. J. C. Long, Mr. Brantley Seymour, and Mr. M. L. McRae,* all of Charleston, S. C., Counsel for Respondent,

April 13, 1944.

MR. ASSOCIATE JUSTICE OXNER delivered the unanimous Opinion of the Court:

This is an action for damages on account of an alleged false arrest. The trial resulted in a verdict for plaintiff. The only question raised by the exceptions is whether the trial Judge erred in refusing defendant's motions for a nonsuit and directed verdict.

The respondent, Mrs. Wingate, owned and operated a grocery store in the City of Charleston. During the early part of the evening, on May, 23, 1940, she sent two young men in her Buick car to a place of business in Charleston for two bags of rice. This car was a 1938 model, bearing license No. E-2092, and was formerly owned by Myers Funeral Home, of Georgetown, South Carolina. Mrs. Wingate purchased it from a used car dealer in Charleston several weeks before, but, according to the police records, it was still registered in the name of the former owner. These two young men were unable to get the rice, as the place was closed. They returned the car to Mrs. Wingate and went home.

In the course of this trip, they drove on Bay Street, where the office of appellant, Postal Telegraph and Cable Company, is located. According to their testimony, they did not stop on Bay Street, but in slowly passing jokingly "hollered at" a messenger boy of appellant, who was on the street outside the office, and told him to "go ahead to work". One of these men had formerly been a messenger boy for appellant, and stated that while he knew most of the boys he did not know this particular messenger boy. A somewhat different version of this occurrence was given by the messenger boy, Robert Jones, who at the time was about seventeen years old. He testified that when he was near the office of appellant, two to four men, whom he did not know, passed along the street in a Buick car and "hollered" across the street, saying "take that damn message in." He said the car stopped and backed about two feet. He further testified that after going into the office to deliver a message, he came back and secured the license number of the car. Fearing that he might be molested further, he said that he went to the police station on his own initiative, reported the incident, giving the license number of the car, and requested the police officers to investigate the matter. In his direct testimony this messenger boy denied mentioning this particular occurrence to anyone connected with appellant. On cross examination he ad-

mitted that he mentioned it to someone in the office but did not recall who it was.

The foregoing incident occurred around 8 p.m. A detective on duty at the office of the police department testified that a messenger boy, who stated that his name was Robert Jones, came to the office about 9:05 p.m., and complained that four men in a Buick car, License No. E-2092, had followed him and near appellant's office "stopped him and tried to take a telegram from him."

The boy stated to this detective that they ought to be arrested and that was "what he came there for." The radio log of the police records showed that at 9:08 p.m. a message was sent to all radio cars to "pick up for detective department" a 1938 Buick sedan, bearing the above-mentioned license number.

Early the following morning respondent, not knowing anything of the occurrence the night before, drove her car to the market. According to her testimony, just as she reached the market, a uniformed police officer, whom she had known for years, jumped on the car and said: "Whoever is in the car is under arrest * * * you are the one I am looking for." She replied that she had not done anything, whereupon the officer said: "I have got orders from the desk to pick up car 2092, and the one driving it." Respondent says that by this time a crowd had gathered around the car. The officer got on the running board and directed her to drive to the police station, and, standing on the side of the car, rode with her to the corner of Anson and Calhoun Streets. At this point the officer alighted from the car, instructed her to go to the police station, and phoned to the police department that she was on the way.

Respondent further testified that she drove to the police station and the officer in charge seemed to be unfamiliar with the matter. He referred her to the chief of the detective department, who was temporarily out of the office. She then went and got the two young men who were in her car

the night before and came back to the police station, at which time the chief of the detective department was present. After a brief discussion, this officer released all of them.

In company with these two young men respondent then went to the manager of appellant's Charleston office. She testified that she asked the manager "about this boy Robert, the boy that worked for him, and he said, yes, the boy came to his office, and he told the boy to get the number of the car and pick up the people that was in it." The following is also taken from her testimony:

"Q. State just what the manager of the Postal Telegraph Company said? A. He said the boy came in and complained, and he said he told him to go and have the car picked up, and the people.

"Q. Told him to go where and have it picked up? A. Go down to the police station."

The officer who made the alleged arrest of respondent testified that he had orders to pick up this car and that while directing school traffic, he saw it pass and followed it to Market Street, where he told respondent, whom he had known for many years, "I am not going to arrest you, but we had orders to pick up car with license Number E-2092, and I will ask you to go to the police station and straighten it out." This officer stated that respondent was agreeable to going and that, with her permission, he rode with her to the corner of Calhoun and Anson Streets, where he got off and phoned to the police station that he had picked up the car, that Mrs. Wingate was in it, and that she was coming to straighten it out.

One of appellant's witnesses, Mr. Richards, testified that at the time complained of he was manager of appellant's Charleston office, with hours from 8 a.m. to 5 or 6 p.m.; that a Mr. Jennings was the night manager; and that Jennings informed him that some one had molested one of the night boys, but he did not recall whether Jennings told him

that the incident had been reported to the police department. This witness admitted that respondent and the two boys came to see him on the morning of the alleged arrest, but denied making the statement to respondent that he directed the boy to go to the police station and have the car and the people in it picked up.

The motions for nonsuit and directed verdict were upon the grounds, (1) that there was no evidence of an arrest of respondent, and (2) that there was no evidence tending to show that Robert Jones at the time complained of was a servant of appellant acting within the scope of his employment.

As to the first ground, we think respondent's own testimony was entirely sufficient to require the submission of the case to the jury on the question of whether the respondent had been unlawfully restrained of her liberty. We must accept this testimony as true in determining whether the trial Judge erred in submitting this question to the jury. In the case of *Westbrook v. Hutchison et al.,* 195 S. C., 101, 10 S. E. (2d), 145, 148, the following statement of the governing principles is quoted with approval: "The use of force is not necessary to constitute false imprisonment. Any genuine restraint constitutes an actionable imprisonment although effected without actual contact with the person. The essential thing is the restraint of the person."

Was the appellant entitled to a nonsuit; or directed verdict, on the second ground?

"It is 'well settled that the liability of a principal for the act of the agent in instituting a malicious prosecution or causing a false arrest or imprisonment is dependent on whether the principal previously authorized the act, or subsequently ratified it, or whether the act was within the scope of the agent's employment.' " *Bushardt v. United Inv. Co.,* 121 S. C., 324, 113 S. E., 637, 641, 35 A. L. R., 637.

Ordinarily the duties of a messenger boy employed by a telegraph company are not such as to give him implied authority to institute in behalf of his employer criminal proceedings. In the case of *Bushardt v. United Inv. Co., supra,* it was held that a mere soda fountain clerk in a drug store has no implied authority as such to cause the arrest of a person suspected of robbing the cash register. See the annotation of this case in 35 A. L. R., page 645. But we think under the circumstances disclosed by the testimony, the jury could have inferred that appellant's manager did have such authority. *Falls v. Palmetto Power & Light Co.,* 117 S. C., 327, 109 S. E., 93; *Whitmire v. Publix Theatre Corporation,* 164 S. C., 487, 162 S. E., 753.

Although there is a sharp conflict in the testimony, in view of the conversation which respondent says she had with the manager shortly after her alleged arrest, there was evidence to support the inference that the conduct of the messenger boy was authorized by the manager.

Appellant's counsel in his argument states the question raised by the second ground of the motion for a nonsuit and directed verdict as follows: "Did the defendant cause or instigate any arrest of the plaintiff?" It is apparent that the question stated in this way is somewhat broader and more comprehensive than was raised when the motions were made. Under the question thus stated, it is argued that all the messenger boy did was to make complaint to the police officers and that the subsequent arrest of the respondent was solely upon the initiative and judgment of the officers and not the boy.

If respondent was arrested by the police officers on their own volition, neither the messenger boy nor his employer could be held liable. Where a person merely directs the attention of a police officer to what he supposes to be a breach of the peace, or gives to such officer

facts indicating such, and the officer, without other direction, arrests the offender on his own responsibility, the person who did nothing more than communicate the facts to the officer is not liable for causing the arrest, even though it is made without a warrant. See annotation in Annotated Cases, 1917-E., at page 404. Where a person has information or knowledge that the law has been violated, he not only has a right, but frequently it is his duty, to communicate such information or facts to the proper officer so as to give such officer the opportunity, if in his judgment it is proper to do so, to take whatever steps may be necessary to apprehend the offender. As said in *Burton v. McNeill,* 196 S. C., 250, 13 S. E. (2d), 10, 11, 133 A. L. R., 603, "Those who honestly seek the enforcement of the law * * * and who are supported by circumstances sufficiently strong to warrant a cautious man in the belief that the party suspected may be guilty of the offense charged, should not be made unduly apprehensive that they will be held answerable in damages."

But it is equally well settled that where a private person induces an officer by request, direction or command to unlawfully arrest another, he is liable for false imprisonment. The charge of false imprisonment is not confined to the party who unlawfully seizes or restrains another, but it likewise extends to any person who may cause, instigate or procure an unlawful arrest.

With the conflicting evidence on the question, we think the jury was properly allowed to determine whether the arrrest of respondent was made under the instigation and direction of appellant, or whether the police authorities acted on their own initiative and volition.

Appellant further contends that in no event were the officers directed to arrest the respondent. It is argued that the police authorities knew that the complaint of the messenger boy was directed only to men and that the arrest of a woman was wholly unauthorized by anything said or done by the

employees of appellant. Assuming that the second ground of the motion embraces this contention, and the question was, therefore, raised in the lower Court, we think the contention is untenable. The direction given by the manager to "have the car picked up and the people" is subject to more than one reasonable inference. It is subject to the interpretation that only the men who molested the boy were to be apprehended. We think it is also susceptible to the construction that appellant's manager intended for the officers to apprehend the car and whoever happened to be in it, so that such occupants might be detained and interrogated for the purpose of securing information which would lead to the identity of the men who molested the messenger boy. The car itself was not an offender and there was no reason to pick it up except for this purpose. We think the possibility that some innocent person might be in the car could have been reasonably anticipated. While the police officers may have been negligent, the jury could have reasonably inferred that appellant set the proceedings in motion which culminated in the unlawful arrest of respondent and that such arrest was a proximate result of the initial conduct of appellant.

In concluding our discussion of this phase of the case, we wish to point out that appellant did not offer its night manager as a witness, although the testimony discloses that he was in town. His testimony as to who informed him that someone had molested one of the night boys; what conversation, if any, he had with this messenger boy; and what communication, if any, he had with the police officers would have thrown considerable light on the issue. Appellant's unexplained failure to call him warrants the inference that his testimony, if presented, would have been unfavorable to its contention. 31 C. J. S., Evidence, § 156, page 853. *Ex Parte Hernlen,* 156 S. C., 181, 153 S. E., 133, 69 A. L. R., 443.

The trial Judge did not err in refusing the motion for nonsuit and directed verdict on the second ground.

All exceptions are overruled and judgment affirmed.

MR. CHIEF JUSTICE BAKER and MESSRS. ASSOCIATE JUSTICES FISHBURNE, STUKES and TAYLOR concur.