**GLOVER v. YONCE et al.**

No. 6212.

United States Court of Appeals Fourth Circuit.

Argued April 2, 1951.

Decided May 7, 1951.

Thomas E. McCutchen, Columbia, S. C. (Wise, Whaley & McCutchen, Columbia, S. C., on brief), for appellant.

Henry Busbee, Aiken, S. C. (Williams & Busbee, Aiken, S. C., on brief), for appellees.

Before PARKER, SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

Marshall Glover was caught in the saw of a lumber mill near Aiken, South Carolina, in February, 1947 and both legs were cut off, one above and one below the knee. He was a native and resident of South Carolina but after his injury he moved to Washington, D. C., and as a resident of the District

brought suit in the District Court below against John W. Yonce and Sam A. Yonce, who owned and operated the mill and employed him as one of the workmen. The case was submitted to the jury and resulted in a verdict and judgment for the plaintiff for $7500 on April 6, 1950; but on October 26, 1950 the District Judge set aside the verdict and entered judgment for the defendants.

The defendants' outfit was a portable saw mill. It comprised a carriage to convey the logs to be cut, the saw, rollers in a horizontal frame to receive and carry the sawed boards away, and an edger which weighed more than one thousand pounds to cut the bark from rough edged boards. Power was transmitted from a six-cylinder Diesel engine by a belt to a shaft on which were mounted a circular saw and three pulleys or wheels. A small pulley nearest the saw carried a vertical belt which furnished power to an overhead apparatus and chain to dispose of the sawdust; a 36 inch pulley carried a horizontal belt from the main shaft to the shaft of the edger 10 feet distant; and another large pulley carried the belt from the engine to the main shaft.

The edger, which was a separate cutting machine, was placed about 3 feet above the ground on wooden blocks, and the belt from the main shaft in operation exerted a strong pull upon it. A brace was therefore used to keep it stationary and to keep the belt taut. At the time of the accident, the brace, according to the testimony of the plaintiff, was a single piece of 2 x 4 lumber which was wedged against the edging machine 3 feet above the ground at one end and ran thence a distance of 8 feet to a block in the ground near the saw. The mill had been set up in this fashion for two weeks and had worked satisfactorily.

The plaintiff was a young man twenty-eight years of age, completely uneducated, who could not read or write or even sign his name. He had worked around saw mills eight or nine years and had operated an edger for five or six years. He worked at defendants' mill nine and a half hours a day. His duty was to receive the boards as they came from the saw on the rollers and, if they were smooth, to send them along to the other workmen; but if there was bark upon a board, it was his job to shift it from the rollers and pass it through the edger. In order to do this work he was stationed in a confined space or alley between the main shaft and saw at one end and the edger at the other, and between the horizontal belts on one side and the roller bed 2 or 3 feet high on the other. Shortly before noon, on the day of the accident, he was operating the edger; and since the logs then being sawed were small, most of the boards had to be edged; and he was obliged, after performing the edging operation, to turn back quickly to receive the boards as they came from the saw. While he was facing the saw, the heavy edger was dislodged from its wooden supports suddenly and without warning, so that it struck him a violent blow on the back and pitched him against the saw when, in an instant, his legs were severed. As quickly as possible he was taken to a nearby hospital, blood transfusions were voluntarily furnished and his life was saved.

The jury were not furnished with a complete account of the accident by eye witnesses. The plaintiff was the only eye witness who testified, and he of course was in no position to know precisely what happened, so that his testimony and explanation were obviously based on what was later told him. The owners of the mill were in the woods and were not present at the mill and did not see the accident; but there were in all six employees, a white sawyer, who was in charge of the mill in the absence of the defendants, and five colored men, including the plaintiff, of whom one was the helper of the sawyer and three took the lumber as it came from the saw and the edger. None of these men were called as witnesses, although one of the colored laborers was still in the defendants' employ and the sawyer had been interviewed by the defendants' lawyers before the trial. The only witnesses for the defendants who had knowledge of the conditions before and after the accident were the defendants themselves, and since they concerned themselves chiefly with the injured man's condition when they reached the scene of the accident, they did

not examine the apparatus carefully until nightfall of the same day.

The plaintiff testified that "as far as I know about it, the belt come off on his side and wound around the pulley and drug the edger against me and knocked me into the saw." He was talking of the belt carried by the 36 inch pulley on the main shaft and running thence to the edger. It happened "just as quick as lightning" and "if I could have seen it as it happened I could have (avoided the edger) but I didn't know nothing until after it done happened." He said that the brace to the edger was a 2 x 4 timber and was not a proper brace, and that if it had been a 2 x 6 brace, the belt would have broken and the edger would have stayed in place and would not have knocked him into the saw. At one time he said that the belt jumped off the edger pulley and got caught in the small sawdust pulley which caused the belt to wind around the shaft; but he admitted that this was an opinion formed after the accident and that he did not know of his own knowledge exactly what happened. The belt had jumped off the pulley many times before, and often it had broken and flapped around before the engine could be stopped, but the brace had never broken before. There was a guard to keep the belt from coming off the pulley on the edger shaft but there was no such guard to keep the belt from coming off the pulley on the main shaft. The plaintiff had seen a guard used to keep the edger belt from slipping off the pulley on the main shaft in a saw mill but it was not a portable mill.

The defense was based on the theory of an unforeseeable accident. The managing owner of the mill freely admitted that the edger belt frequently broke or jumped off the pulley on the main shaft and flapped around until the engine was stopped; but he said that never before had the belt wound itself around the main shaft and exerted such a pull against the edger shaft as to break the edger brace and dislodge the edger. On this occasion when he examined the equipment late in the afternoon on the day of the accident he found the belt wound around the main shaft between the edger belt pulley and the drive belt pulley so that it had to be cut loose with a knife, and he found the edger brace broken and the edger itself thrown from its position, a distance of about 8 feet, against the sawdust rig causing it to collapse. He did not see the accident and accordingly did not know whether the belt jumped off before or after the brace was broken; but he was firmly of the opinion that the displacement and winding of the belt produced the irresistible force which caused the brace to break.

He denied that a 2 x 4 brace was used on the morning of the accident, as the plaintiff testified, but he was unwilling to say that such a brace was adequate. He testified that he always used a 3.5 x 4.5 brace, that is to say, a brace approximately double the size of a 2 x 4.

He and other mill men said that it was not practicable to install a guard to keep the edger belt from slipping from the shaft in a portable mill. They also agreed that they had never known a dislodged belt to wind itself around the shaft and pull down the edger. Some of them also said that a 2 x 4 brace for the edger is sufficient.

Upon this testimony, the judge submitted to the jury the issue of negligence on the part of the defendants and of contributory negligence and assumption of risk on the part of the plaintiff. He instructed the jury that the only evidence of negligence on the defendants' part related to the sufficiency of the prop or brace of the edger, and they were told to decide whether the edger was properly set up and braced, and if they should answer this question in the affirmative, and should also find that the manner in which the belt behaved on this occasion was unforeseeable, they should find a verdict for the defendants. On this instruction, as we have seen, the jury found a verdict for the plaintiff.

Later the judge reached the conclusion that the case should not have been submitted to the jury. His opinion was based primarily on the uncontradicted evidence of the defendants that an accident of this precise kind had never occurred before to their knowledge and could not have been foreseen by them on this occasion since the various parts of the equipment were working well and were in good condition.

We think that the first ruling was correct in that the evidence presented a question for the jury's decision. The judge did not undertake to say, and it cannot be said that the plaintiff was guilty of contributory negligence or that he assumed the risk as a matter of law. He was familiar with the operation of the mill and was charged, as were other employees, with the duty of tightening the belt if it became slack for any reason; but the mill had been running well during the morning and there is no evidence that the belt was loose when the accident occurred. Moreover, the plaintiff, a common laborer, was not charged with responsibility for the sufficiency and safety of the equipment but relied, and was justified in relying, upon his employer in these respects. The most that can be said in this respect is that these were jury questions, which were in fact fairly submitted to the jury at the time of the trial.

When the case is viewed from the defendants' standpoint in the light of their duty to furnish safe appliances and a safe place for their employees to work, a number of circumstances combine to present a debatable question. If the surmise of the defendants as to the cause of the accident be accepted, it does not necessarily follow that the peculiar manner in which it occurred could not have been foreseen. A loose and flapping belt in the neighborhood of a rapidly revolving shaft and pulley obviously suggests a possibility of injury to workmen on the job; and the duty of an employer to institute proper safeguards would be disregarded if he could excuse himself on the mere ground that the behavior of the equipment at the moment of an accident was without precedent in the knowledge of himself or his acquaintances in the industry.

The insufficiency of the brace itself may have been the basis of the jury's finding. Since the defendants by their own admission customarily used a brace twice the size of that employed, according to the plaintiff, on the day of the accident, the jury may well have concluded that the collapse of the brace rather than the slipping of the belt caused the breakdown, and that the winding of the belt around the shaft followed this event. In addition, the failure of the defendants to produce available eye witnesses who had been or were in their employ at the time of the trial may easily have led the jury to believe that their evidence would not support the defendants' theory. Robinson v. Duke Power Co., 213 S.C. 185, 48 S.E.2d 808; Gaskins v. Firemen's Ins. Co., 206 S.C. 213, 33 S.E.2d 498; Wingate v. Postal Telegraph & Cable Co., 204 S.C. 520, 30 S.E.2d 307.

The law with respect to unusual exceptional circumstances is the same in South Carolina as elsewhere. "The law requires only reasonable foresight, and when the injury complained of is not reasonably foreseeable, in the exercise of due care, there is no liability. One is not charged with foreseeing that which is unpredictable or that which could not be expected to happen." Locklear v. Southeastern Stages, Inc., 193 S.C. 309, 319, 8 S.E.2d 321, 325; "Bare possibility is not sufficient. * * * Events too remote to require reasonable prevision need not be anticipated." Brady v. Southern Ry. Co., 320 U.S. 476, 483, 64 S.Ct. 232, 236, 88 L.Ed. 239.

It is also the law in South Carolina, however, as it is elsewhere, that "it is not necessary to show that a person charged with negligence should have foreseen the particular consequences or injury that resulted. It is enough that he should have foreseen that his negligence would probably result in injury of some kind to some one." Sandel v. State, 115 S.C. 168, 181, 104 S.E. 567, 571, 13 A.L.R. 1268; Tobias v. Carolina Power & Light Co., 190 S.C. 181, 186, 2 S.E. 2d 686.

The defendants in the pending case were dealing with a dangerous instrumentality and their duty to furnish adequate protection to their employees was accordingly increased. In this connection the following quotation from the Supreme Court of South Carolina in Eargle v. Sumter Lighting Co., 110 S.C. 560, 567, 96 S.E. 909, 911, is pertinent: "What we have held is that, in dealing with an agency known to be so dangerous and deadly, a very high degree of care is required; but that is nothing more than a different way of expressing what is axiomatic in the law; that the

degree of care to be exercised in every case should be commensurate with the danger—the greater the danger, the greater the care required—that a very high degree of danger calls for a very high degree of care".

Even if it should be thought that the defendants' mill was set up in accordance with the customs of the industry, a jury question would still persist for "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." Texas & Pac. R. Co. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905; Elkton Auto Sales Corp. v. State of Md., 4 Cir., 53 F.2d 8; American Coal Co. of Allegany County v. De Wese, 4 Cir., 30 F.2d 349.

The judgment is reversed and the case remanded with directions to reinstate the original judgment based upon the jury's verdict.

Reversed and Remanded.