Meredith HUFFMAN, Appellant,

v.

SUNSHINE RECYCLING, LLC and Aiken Electric
Cooperative, Inc., Respondents.

**Appellate Case No. 2014–001492**
**Opinion No. 5417**

Court of Appeals of South Carolina.

Heard May 4, 2016
Filed June 22, 2016
Rehearing Denied September 15, 2016

516

J. Todd Rutherford, of The Rutherford Law Firm, LLC and Robert F. Goings, of Goings Law Firm, LLC, both of Columbia, for Appellant.

Breon C.M. Walker and Jessica A. Waller, both of Gallivan, White & Boyd, P.A., of Columbia, for Respondent Sunshine Recycling, LLC.

Pope D. Johnson, III, of Columbia, for Respondent Aiken Electric Cooperative, Inc.

GEATHERS, J.

In this action for false imprisonment and malicious prosecution, Appellant Meredith Huffman seeks review of the circuit court's order granting summary judgment to Respondents, Sunshine Recycling, LLC (Sunshine) and Aiken Electric Cooperative, Inc. (Aiken) (collectively, Respondents). Huffman argues there were genuine issues of material fact concerning whether Respondents caused, instigated, or procured her arrest and the extent of Respondents' participation in law enforcement's charging Huffman with receiving stolen goods. We reverse and remand for a trial on the merits of Huffman's false imprisonment and malicious prosecution claims.[1]

## FACTS/PROCEDURAL HISTORY

On May 16, 2010, an unidentified black male broke into Aiken's Orangeburg facility. Shortly thereafter, a white Ford F-150 truck was seen leaving the facility's parking lot. The next day, Mark Goss, Aiken's Loss Control and Safety Coordinator, viewed the surveillance video and advised Deputy Maurice Huggins of the Orangeburg County Sheriff's Department that several pounds of solid copper and several pounds of aluminum tie wire had been stolen from Aiken. At that time, Goss estimated the value of the stolen metal to be approximately $330.

---

1. We decline to address Aiken's additional sustaining ground. *See I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000) ("It is within the appellate court's discretion whether to address any additional sustaining grounds." (footnote omitted)); *id.* at 421, 526 S.E.2d at 724 ("[T]he respondent may raise an additional sustaining ground that was not even presented to the lower court, but the appellate court is likely to ignore it." (footnote omitted)).

On that same day, Goss also checked with Sunshine, a metal recycling business, to see if anyone had tried to sell the stolen metal to Sunshine. Goss discovered the stolen metal at Sunshine and spoke with Sunshine's owner, Joseph Rich. Goss told Rich he was looking for a black male in a white Ford pickup truck.

Officer Ashley Aldridge of the Orangeburg County Sheriff's Department also appeared at Sunshine to investigate the theft. Rich, who claimed to speak Spanish, spoke to an unnamed Spanish-speaking employee working in the metal drop-off area but failed to mention that Goss was looking for a black male in a white Ford pickup truck. Rich's employee allegedly told Rich that a white woman was the first person to drop off metal that morning. Although the individual who stole the metal from Aiken was a black male, Goss testified in his deposition that in the metal industry, "it's not uncommon for girlfriends and wives to bring metal in and drop them off. It happens all the time."

Rich told Officer Aldridge and Goss they were welcome to view the receipts documenting the amount paid to customers who had sold metal to Sunshine and the time-stamped video footage of customers waiting at the payment window. Officer Aldridge viewed this video and saw Huffman waiting for her payment. Officer Aldridge also obtained a receipt for the metal sold by Huffman, which indicated a payment of $53 to her.

Subsequently, Goss spoke with Officer James Ethridge of the Orangeburg County Sheriff's Department and told Officer Ethridge that he had spoken with Huffman while she was waiting to get paid for "the items that she had just brought in."[2] Goss also told Officer Ethridge that "he viewed the items after she left and identified them as" belonging to Aiken. Actually, when Goss identified the metal left in Sunshine's drop-off area as the metal stolen from Aiken, he was viewing what had been commingled with the metal left by Huffman. Goss recognized that some of the copper and aluminum in the area had characteristics distinguishable from those of the copper and aluminum stolen from Aiken. Goss admitted in his deposition, "it was all right there in like a big pile kind of, and

---

2. In his deposition, Goss denied ever speaking with Huffman.

I don't remember if it was on top of each other or what. It was all right there in one section." When Rich advised Goss that Huffman left the stolen metal, Goss apparently did not mention the distinction he had made between the different types of copper and aluminum in the area. Further, Rich's employee apparently did not tell Rich that a black male in a white Ford pickup truck dropped off metal immediately after Huffman dropped off her metal.

On the next day, May 18, 2010, Officer Ethridge visited Sunshine to photograph the metal identified as stolen. While he was there, he also spoke with Rich, who stated he had not yet obtained a copy of the video showing customers dropping off their metal but he would contact Palmetto Security Cameras to request Alan Price to "burn" a copy of the video for Officer Ethridge. During the next three days, Goss called Officer Ethridge several times, asking him what he was going to do with the case. During this same time period, Officer Ethridge called Rich several times, asking when he could obtain the video of customers dropping off metal.

While still waiting on this video, Officer Ethridge contacted a local magistrate on May 21, 2010, to obtain a warrant for Huffman's arrest for receiving stolen goods.[3] After Huffman learned about the warrant, she advised Officer Ethridge that she sold metal to Sunshine but it was not stolen; rather, it was salvaged from a mobile home belonging to her and her husband after they tore down the home. Officer Ethridge instructed Huffman to meet him at the Sheriff's Department at 9:00 a.m. the next morning, June 2, 2010. At that time, Huffman gave a statement to Officer Ethridge, and he formally served Huffman with the arrest warrant. Officer Ethridge then placed Huffman in handcuffs, and she was required to change into a prison jumpsuit and wait for the next bond hearing. She was unable to telephone her home to check on her children, who were not being supervised by an adult, and she was required to appear at the bond hearing handcuffed and shackled. Huffman obtained a personal recognizance bond, and she was finally released at approximately 5:00 p.m.

---

3. This offense is considered a "misdemeanor triable in magistrate[']s court or municipal court ... if the value of the property is two thousand dollars or less." S.C. Code Ann. § 16–13–180 (C)(1) (2015).

After Huffman's arrest and release, Officer Ethridge finally was able to view the video of Huffman dropping off her metal at Sunshine. Goss viewed this video around the same time that Officer Ethridge viewed it, although Goss had actually received the video **before** Huffman was arrested. Rich never viewed the video.

In his report, Officer Ethridge stated that he watched "the video of where [Huffman] took the items off of her truck and she did have some copper that resembles what was taken in the back of her truck, but the aluminum was sheeting[,] not wire." He further stated he advised Rich "that after viewing the video, it does not show her with the same items that w[ere] taken. Due to these facts[,] there is not enough evidence to support this case. I will be dismissing these charges on Huffman." Notably, the video also showed that the customer following Huffman was the black male Goss had seen on Aiken's surveillance video, Eugene James, unloading metal from the white Ford pickup truck he was driving.

Near the end of his report, Officer Ethridge noted, "At this time[,] I am not comfortable with this case due to the witnesses gave [sic] me false information the first time." After Officer Ethridge dropped the charge of receiving stolen goods against Huffman, the Sheriff's Department finally located James. James ultimately pled guilty to the charges brought against him.

On May 9, 2012, Huffman filed a complaint against the Sheriff's Department and Sunshine, asserting claims for negligence, false imprisonment, and malicious prosecution. In May 2013, Huffman amended her complaint to add Aiken as a defendant. On or about June 27, 2013, Aiken filed a motion to dismiss Huffman's complaint against it. Huffman later settled her claims against the Sheriff's Department, and the two parties filed a stipulation dismissing the Sheriff's Department from the action on or about December 18, 2014. Several weeks later, Sunshine filed a motion for summary judgment, and the circuit court conducted a hearing on this motion as well as Aiken's motion to dismiss on March 10, 2014. Upon Aiken's request, the circuit court converted Aiken's motion to dismiss into a summary judgment motion.

On or about April 3, 2014, the circuit court granted Respondents' summary judgment motions. The circuit court later denied Huffman's motion to alter or amend the written order granting summary judgment. This appeal followed.

## ISSUES ON APPEAL

1. Were there issues of fact material to whether Huffman's arrest was lawful?

2. Were there issues of fact material to whether Respondents caused, instigated, or procured Huffman's arrest?

3. Were there issues of fact material to whether there was probable cause to charge Huffman with receiving stolen goods?

4. Were there issues of fact material to Respondents' participation in local law enforcement's charging Huffman with receiving stolen goods?

## STANDARD OF REVIEW

This court reviews the grant of a summary judgment motion under the same standard applied by the trial court pursuant to Rule 56(c), SCRCP. *Jackson v. Bermuda Sands, Inc.*, 383 S.C. 11, 14 n.2, 677 S.E.2d 612, 614 n.2 (Ct. App. 2009). Rule 56(c), SCRCP, provides summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "In determining whether any triable issues of fact exist for summary judgment purposes, the evidence and all the inferences [that] can be reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party." *Hancock v. Mid–S. Mgmt. Co.*, 381 S.C. 326, 329–30, 673 S.E.2d 801, 802 (2009); *Fleming v. Rose*, 350 S.C. 488, 493–94, 567 S.E.2d 857, 860 (2002).

Further, "[s]ummary judgment should not be granted even when there is no dispute as to evidentiary facts if there is disagreement concerning the conclusion to be drawn from those facts." *Lanham v. Blue Cross & Blue Shield of S.C., Inc.*, 349 S.C. 356, 362, 563 S.E.2d 331, 333 (2002). "On appeal

from an order granting summary judgment, the appellate court will review all ambiguities, conclusions, and inferences arising in and from the evidence in a light most favorable to the non-moving party below." *Id.*

Moreover, "in cases applying the preponderance of the evidence burden of proof, the non-moving party is only required to submit a mere scintilla of evidence in order to withstand a motion for summary judgment." *Hancock*, 381 S.C. at 330, 673 S.E.2d at 803. "At the summary judgment stage of litigation, the court does not weigh conflicting evidence with respect to a disputed material fact." *S.C. Prop. & Cas. Guar. Ass'n v. Yensen*, 345 S.C. 512, 518, 548 S.E.2d 880, 883 (Ct. App. 2001). "[B]ecause summary judgment is a drastic remedy, it should be cautiously invoked to ensure a litigant is not improperly deprived of a trial on disputed factual issues." *Lord v. D & J Enterprises, Inc.*, 407 S.C. 544, 553, 757 S.E.2d 695, 699 (2014).

## LAW/ANALYSIS

### I. False Imprisonment

Huffman contends the circuit court erred in granting summary judgment to Respondents on her false imprisonment claim because there were genuine factual issues material to the unlawfulness of her arrest and the complicity of both Sunshine and Aiken in the arrest. We agree.

### A. Probable Cause

The essence of the tort of false imprisonment consists of depriving a person of his liberty *without lawful justification.* To prevail on a claim for false imprisonment, the plaintiff must establish: (1) the defendant restrained the plaintiff, (2) the restraint was intentional, and (3) the restraint was unlawful.

The fundamental issue in determining the lawfulness of an arrest is *whether there was probable cause to make the arrest.* Probable cause is defined as a good faith belief that a person is guilty of a crime when this belief rests on such grounds as would induce an ordinarily prudent and cautious man, under the circumstances, to believe likewise. *Although the question of whether probable cause exists is ordinarily*

*a jury question, it may be decided as a matter of law when the evidence yields but one conclusion.*

McBride v. Sch. Dist. of Greenville Cty., 389 S.C. 546, 567, 698 S.E.2d 845, 856 (Ct. App. 2010) (emphases added) (quoting *Law v. S.C. Dep't of Corr.*, 368 S.C. 424, 440–41, 629 S.E.2d 642, 651 (2006)).

■ Here, it is undisputed that Officer Eldridge intended to restrain Huffman's liberty when he arrested her. Therefore, we need only consider whether there was a scintilla of evidence, viewed in the light most favorable to Huffman, **from which a juror could reasonably conclude** that the restraint was unlawful, i.e., made without probable cause. *See Lanham*, 349 S.C. at 362, 563 S.E.2d at 333 ("Summary judgment should not be granted even when there is no dispute as to evidentiary facts if there is disagreement concerning the conclusion to be drawn from those facts."). In other words, to send this false imprisonment claim to the jury, the court need only find a scintilla of evidence, viewed in the light most favorable to Huffman, from which a juror could reasonably conclude that Officer Ethridge's belief in Huffman's guilt did **not** rest "on such grounds as would induce an ordinarily *prudent and cautious* man, under the circumstances, to believe likewise." *McBride*, 389 S.C. at 567, 698 S.E.2d at 856 (emphasis added) (defining probable cause) (quoting *Law*, 368 S.C. at 441, 629 S.E.2d at 651). As we engage in such an analysis, we must "review all *ambiguities*, conclusions, and inferences arising in and from the evidence in a light most favorable to [Huffman]." *Lanham*, 349 S.C. at 362, 563 S.E.2d at 333 (emphasis added).

Officer Ethridge relied on the following information in forming his belief in Huffman's guilt: (1) Officer Aldridge's report indicating Rich and Goss told him Huffman brought Aiken's stolen metal into Sunshine's facility; (2) Rich's oral statement to Officer Ethridge that "his employees [who] work in the copper area advised that Huffman was the individual who brought the merchandise in"; (3) a video of Huffman waiting at the payment window in the main office to get paid for the metal she brought in and her presentation of her driver's license to complete the transaction; (4) Goss's oral statement that he spoke to Huffman while she was at Sunshine's main office "waiting to get paid for the items that she

had just brought in" and that Goss "viewed the items after she left and identified them as being theirs," i.e., the metal stolen from Aiken; and (5) the ticket/receipt showing Sunshine's payment of $53 to Huffman for the aluminum and copper she left at Sunshine.

As to the statements made by Rich and Goss to Officers Aldridge and Ethridge, Officer Ethridge knew this information was based on Rich's allegations that (1) an unidentified Spanish-speaking employee stated a "white woman" brought in metal resembling the metal Goss identified as stolen from Aiken and (2) Rich spoke and understood Spanish.[4] Neither the employee nor Rich provided a written statement to police. In a light most favorable to Huffman, this evidence indicates an unreliable ground on which to rest a belief in Huffman's guilt.

Further, the receipt for $53 stands in stark contrast to the $330 estimate of the value of the stolen metal. A juror could reasonably conclude that this anomaly would prevent an ordinarily prudent and cautious man from believing Huffman sold the metal stolen from Aiken. *See Lanham*, 349 S.C. at 362, 563 S.E.2d at 333 ("Summary judgment should not be granted even when there is no dispute as to evidentiary facts if there is disagreement concerning the conclusion to be drawn from those facts."); *id.* ("On appeal from an order granting summary judgment, the appellate court will review all ambiguities, conclusions, and inferences arising in and from the evidence in a light most favorable to the non-moving party below."). A juror could also reasonably conclude that an ordinarily prudent and cautious man would have waited to view the video showing Huffman dropping off her metal, which Rich promised was forthcoming, before seeking an arrest warrant.

Probable cause may be decided as *a matter of law* only "when the evidence yields but one conclusion." *McBride*, 389 S.C. at 567, 698 S.E.2d at 856 (quoting *Law*, 368 S.C. at 436, 629 S.E.2d at 649). This is not a case where the sole conclusion

---

4. Officer Ethridge's report states that Officer Aldridge observed "the business video surveillance and observed Huffman bringing the merchandise in and selling it to Sunshine." However, the video Officer Aldridge observed merely showed Huffman waiting at the payment window; it does not show Huffman dropping off her metal in the back area of Sunshine's facility.

to be reached is that there was probable cause to arrest Huffman. The question should have gone to the jury.

## B. Respondents' Complicity

 [W]here a private person induces an officer by *request, direction or command* to unlawfully arrest another, he is liable for false imprisonment. The charge of false imprisonment is not confined to the party who unlawfully seizes or restrains another, but it likewise extends to any person who may *cause, instigate or procure* an unlawful arrest.

*Wingate v. Postal Tel. & Cable Co.*, 204 S.C. 520, 528, 30 S.E.2d 307, 311 (1944) (emphases added). On the other hand, Where a person merely directs the attention of a police officer to what he supposes to be a breach of the peace, or gives to such officer facts indicating such, and the officer, without other direction, arrests the offender on his own responsibility, the person who did nothing more than communicate the facts to the officer is not liable for causing the arrest, even though it is made without a warrant. Where a person has information or knowledge that the law has been violated, he not only has a right, but frequently it is his duty, to communicate such information or facts to the proper officer so as to give such officer the opportunity, if in his judgment it is proper to do so, to take whatever steps may be necessary to apprehend the offender. ... "Those who honestly seek the enforcement of the law ... and who are *supported by circumstances sufficiently strong to warrant a cautious man in the belief that the party suspected may be guilty* of the offense charged, should not be made unduly apprehensive that they will be held answerable in damages."

*Id.* at 527–28, 30 S.E.2d at 310–311 (second alteration by *Burton v. McNeill*, 196 S.C. 250, 253, 13 S.E.2d 10, 11 (1941)) (emphasis added) (citations omitted) (quoting *Burton*, 196 S.C. at 253–54, 13 S.E.2d at 11).

### 1. Aiken

 The following information was available to Goss prior to Huffman's arrest: (1) Rich's oral statement about what his Spanish-speaking employee told him, i.e., a white woman was

the first person to drop off metal on the morning in question; (2) the metal Goss identified as being stolen was actually commingled with Huffman's metal, a fact Goss apparently did not share with anyone before Huffman's arrest; (3) the video of Huffman and James dropping off metal at Sunshine, although Goss failed to view the video until after Huffman's arrest; and (4) the $53 receipt for Huffman's metal, although Goss did not ask Rich to show him the receipt until after Huffman's arrest. A reasonable juror could conclude that Goss was not "supported by circumstances sufficiently strong to warrant a cautious man in the belief that [Huffman was] guilty of the offense charged." *Wingate*, 204 S.C. at 528, 30 S.E.2d at 310–311 ("Those who honestly seek the enforcement of the law ... and who are supported by circumstances sufficiently strong to warrant a cautious man in the belief that the party suspected may be guilty of the offense charged, should not be made unduly apprehensive that they will be held answerable in damages." (alteration by *Burton*) (quoting *Burton*, 196 S.C. at 253–54, 13 S.E.2d at 11)).

Further, Huffman points to the following evidence showing that Goss, as Aiken's agent, induced her arrest: (1) Officer Ethridge stated in his report that Goss called him "several times about moving further with the case" and (2) Officer Aldridge testified that Goss indicated "a sense of urgency" in obtaining a resolution to the case and that he was "eager to see that the [S]heriff's [D]epartment arrest someone for this alleged crime." Officer Aldridge was not certain whether Goss expressed this sense of urgency in May 2010, before Huffman's arrest, or in June 2010, before the Sheriff's Department located James. Aldridge later testified that his "urgency" comment could have referred to arresting either Huffman or James. Officer Aldridge elaborated,

> A And [Goss] told me that he would like to see something done. You said earlier that it's not uncommon for someone to want to see something done, especially within his line of work.
>
> Now, that being said, he also expressed to me that he was a reserve deputy sheriff and he expected something to be done.

Moreover, Officer Ethridge testified,

I didn't have the video at that point in time so [Goss] wanted to know what I was going to do. Was I going to try and arrest her, lock her up, you know, speak with a magistrate, what to do. On the 21st, that's what I did is [sic] I went and spoke with a magistrate.

Q Did you feel that [Goss] was urging you to prosecute [Huffman]?

. . .

He was calling me. He was calling me just like any other victim would. You know, what are you doing? You know, what—I mean, he had people he had to answer to . . .

. . .

Q Okay. And the reason he was calling you is because he wanted—

A To know what I was going to do with the case. Was I—

. . .

—going to arrest her, yeah.

Officer Ethridge also testified "I had spoke[n] with Sunshine [s]everal times[,] trying to obtain a copy of the video and [Goss] was calling me, wanting to know what I was doing with the case."

This evidence belies Aiken's contentions that Goss was merely providing "factual information" to the Sheriff's Department. A juror could reasonably conclude from the foregoing evidence that Goss induced Officer Ethridge "by request, direction or command to unlawfully arrest" Huffman or "cause[d], instigate[d] or procure[d]" the arrest. *Wingate*, 204 S.C. at 528, 30 S.E.2d at 311 ("[W]here a private person induces an officer by request, direction or command to unlawfully arrest another, he is liable for false imprisonment. The charge of false imprisonment is not confined to the party who unlawfully seizes or restrains another, but it likewise extends to any person who may cause, instigate or procure an unlawful arrest."); *Lanham*, 349 S.C. at 362, 563 S.E.2d at 333 ("Summary judgment should not be granted even when there is no dispute as to evidentiary facts if there is disagreement concerning the conclusion to be drawn from those facts."); *id.* ("On appeal from an order granting summary judgment, the appellate court will review all ambiguities, conclusions, and

inferences arising in and from the evidence in a light most favorable to the non-moving party below.").

## 2. Sunshine

██ Officer Ethridge testified that when he visited Sunshine, *"[t]hey* were guaranteeing that the metal that [Huffman] brought in was the metal—[Goss] was saying this is 100 percent our metal from [Aiken] and the [receipt] was showing the weights, everything, was—was co—everything was looking the same." (emphasis added). It is unclear whether "they" referred to Rich, as Sunshine's agent, or Goss, as Aiken's agent, or both. Therefore, a jury could reasonably infer that either or both men made this representation.

Further, Rich admitted he did not bother to ask his Spanish-speaking employee to identify the second or third person who had dropped off metal on the morning in question. He stated, "That's what the cameras are for." Yet, Rich never bothered to view the video himself despite the fact that he could have obtained a copy of the video before Huffman's arrest.[5]

Moreover, in explaining why he did not view the video of Huffman dropping off her metal before arresting Huffman, Officer Ethridge indicated that he called Alan Price, with Palmetto Security Cameras, several times. The following exchange then occurred:

Q So either—you didn't personally see the video or watch the video at Sunshine. You were told by Sunshine that it showed [Huffman]—

A Correct.

Q —with the—

. . .

[A] She—yes, yes.

A juror could reasonably infer from this testimony that Rich, who never bothered to view the video himself, represented to Officer Ethridge that the video would show Huffman dropping off the $330 worth of metal stolen from Aiken. Based on the foregoing circumstances, a reasonable juror could conclude

---

5. Goss was able to obtain a copy of the video before Huffman's arrest. Therefore, presumably, Rich was able to do so as well.

that Rich's representation to Officer Ethridge was not "supported by circumstances sufficiently strong to warrant a cautious man in the belief that [Huffman was] guilty of the offense charged." *Wingate*, 204 S.C. at 528, 30 S.E.2d at 311 (quoting *Burton*, 196 S.C. at 253–54, 13 S.E.2d at 11). A reasonable juror could also conclude that Rich "cause[d], instigate[d] or procure[d]" Huffman's arrest. *Wingate*, 204 S.C. at 528, 30 S.E.2d at 311.

In sum, Huffman showed, at the very least, a scintilla of evidence that both Goss and Rich induced Officer Ethridge "by request, direction or command to unlawfully arrest" Huffman or "cause[d], instigate[d] or procure[d]" the arrest. *Wingate*, 204 S.C. at 528, 30 S.E.2d at 311. Therefore, we reverse summary judgment for Respondents on Huffman's false imprisonment claim. *See Hancock*, 381 S.C. at 330, 673 S.E.2d at 803 ("[I]n cases applying the preponderance of the evidence burden of proof, the non-moving party is only required to submit a mere scintilla of evidence in order to withstand a motion for summary judgment."); *Lanham*, 349 S.C. at 362, 563 S.E.2d at 333 ("Summary judgment should not be granted even when there is no dispute as to evidentiary facts if there is disagreement concerning the conclusion to be drawn from those facts."); *id.* ("On appeal from an order granting summary judgment, the appellate court will review all ambiguities, conclusions, and inferences arising in and from the evidence in a light most favorable to the non-moving party below.").

## II. Malicious Prosecution

Huffman maintains the circuit court erred in granting summary judgment to Respondents on her malicious prosecution claim because there were genuine factual issues material to probable cause as well as the complicity of both Sunshine and Aiken in proceeding with the charge of receiving stolen goods against her. We agree.

▮▮▮▮ "[T]he elements of malicious prosecution are (1) the institution or continuation of original judicial proceedings; (2) by or at the instance of the defendant; (3) termination of such proceedings in plaintiff's favor; (4) malice in instituting such proceedings; (5) lack of probable cause; and (6) resulting injury or damage." *McBride*, 389 S.C. at 565–66, 698 S.E.2d at

855. "In this cause of action, malice is 'the deliberate intentional doing of a wrongful act without just cause or excuse.'" *Id.* (quoting *Eaves v. Broad River Elec. Coop., Inc.*, 277 S.C. 475, 479, 289 S.E.2d 414, 416 (1982)). "Malice does not necessarily mean a defendant acted out of spite, revenge, or with a malignant disposition...." *Law*, 368 S.C. at 437, 629 S.E.2d at 649.

> Malice also may proceed from an ill-regulated mind which is *not sufficiently cautious* before causing injury to another person. Moreover, malice may be *implied* where the evidence reveals a disregard of the consequences of an injurious act, without reference to any special injury that may be inflicted on another person. Malice also may be *implied* in the doing of an illegal act for one's own gratification or purpose without regard to the rights of others or the injury which may be inflicted on another person. In an action for malicious prosecution, malice may be *inferred* from a lack of probable cause to institute the prosecution.

*Id.* (emphases added). It is the plaintiff's burden "to show that the prosecuting person or entity lacked probable cause to pursue a criminal or civil action against him." *Id.* at 436, 629 S.E.2d at 649.

> Probable cause means "the extent of such facts and circumstances as would excite the belief in a *reasonable mind* acting on the facts within the knowledge of the prosecutor that the person charged was guilty of a crime for which he has been charged, and only those facts and circumstances which were or *should have been known* to the prosecutor at the time he instituted the prosecution should be considered." In determining the existence of probable cause, the facts must be "regarded from the point of view of the party prosecuting; the question is not what the actual facts were, but what he honestly believed them to be." ... Although the question of whether probable cause exists is ordinarily a jury question, it may be decided as a matter of law when the evidence yields but one conclusion.

*Id.* (emphases added) (citations omitted).[6]

 In the light most favorable to Huffman, there is at least a scintilla of evidence, as highlighted in our discussion of

---

6. Notably, the plaintiffs in *Law* were indicted by a grand jury for the offenses for which they were arrested, and our supreme court noted,

the false imprisonment claim, from which a juror could reasonably conclude (1) Officer Ethridge lacked probable cause to pursue a warrant for Huffman's arrest and (2) this pursuit was "at the instance of" both Respondents. *See supra*; *Law*, 368 S.C. at 437, 629 S.E.2d at 649 ("In an action for malicious prosecution, malice may be inferred from a lack of probable cause to institute the prosecution."); *McBride*, 389 S.C. at 565–66, 698 S.E.2d at 855 (setting forth the elements of a malicious prosecution claim); *Hancock*, 381 S.C. at 330, 673 S.E.2d at 803 ("[I]n cases applying the preponderance of the evidence burden of proof, the non-moving party is only required to submit a mere scintilla of evidence in order to withstand a motion for summary judgment."); *Lanham*, 349 S.C. at 362, 563 S.E.2d at 333 ("Summary judgment should not be granted even when there is no dispute as to evidentiary facts if there is disagreement concerning the conclusion to be drawn from those facts."); *id.* ("On appeal from an order granting summary judgment, the appellate court will review all ambiguities, conclusions, and inferences arising in and from the evidence in a light most favorable to the non-moving party below.").

Based on the foregoing, we reverse summary judgment for Respondents on Huffman's malicious prosecution claim.

## CONCLUSION

When we view all ambiguities, conclusions, and inferences arising in and from the evidence in a light most favorable to Huffman, as we are required to do,[7] we find at least a scintilla of evidence from which a juror could reasonably conclude that Officer Ethridge's pursuit of a warrant for Huffman's arrest and her subsequent arrest were made without probable cause and that Goss and Rich set these actions in motion. Because this evidence should have gone to the jury, we reverse the

---

"South Carolina has long embraced the rule that a true bill of indictment is prima facie evidence of probable cause in an action for malicious prosecution." *Id.* However, the offense for which Huffman was arrested, receiving stolen goods, is a misdemeanor triable in magistrate's or municipal court. *See supra* n.2. Charges prosecuted in magistrate's court are exempt from the requirement that an indictment be presented to a grand jury before a criminal charge is prosecuted. S.C. Const. art. I, § 11; S.C. Code Ann. § 17–19–10 (2014).

7. *Lanham*, 349 S.C. at 362, 563 S.E.2d at 333.

circuit court's order and remand for a trial on the merits of Huffman's false imprisonment and malicious prosecution claims.

**REVERSED AND REMANDED.**

HUFF and KONDUROS, JJ., concur.